John DOE, Esquire (Pseudonym
for an attorney), Plaintiff

and

Equal Employment Opportunity
Commission, Plaintiff–
Intervenor

v.

KOHN NAST & GRAF, P.C. d/b/a Kohn
Klein Nast & Graf, P.C. and Kohn Sa-
vett Klein & Graf, P.C., Harold E. Kohn,
and Steven Asher, Defendants.

Civ. A. No: 93–4510.

United States District Court,
E.D. Pennsylvania.

Aug. 4, 1994.

As Amended Sept. 2, 1994.

See also: 853 F.Supp. 150.

Alan B. Epstein, Jablon, Epstein and Wolf, Philadelphia, PA, for plaintiff and John Doe, Esquire, pro se.

Carmen R. Matos and Deborah M. Floyd, Mary M. Tiernan and Jose L. Perez, E.E.O.C., Philadelphia, PA, for intervenor-plaintiff.

J. Freedley Hunsicker, Jr., Patrick T. Ryan, Gregg R. Melinson, Drinker, Biddle & Reath; Donald J.P. Sweeney, Robyn F. Mc Grath, Sweeney, Sheehan & Spencer; and Barbara A. O'Connell, Philadelphia, PA, for defendants.

Ronald P. Schiller, Piper & Marbury, Philadelphia, PA, and Madeleine Schachter, CBS, New York City, for CBS, Inc., movant.

Carmen R. Matos, E.E.O.C., Philadelphia, PA, for Ellen Braffman, movant.

Carl A. Solano, Schnader, Harrison, Segal & Lewis, Philadelphia, PA, for respondent.

GAWTHROP, District Judge.

This case, before the court on defendants' motion for summary judgment, involves a lawyer infected with the Human Immunodeficiency Virus ["HIV"] who claims that his law firm fired him because of his infection.

Plaintiff's First Amended Complaint alleges that the defendants violated a number of federal and state statutes: Title I of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* [ADA], as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981a; section 510 of the Employee Retirement In-

come Security Act of 1974, 29 U.S.C. § 1140 [ERISA]; the Pennsylvania Human Relations Act, 43 Pa.S. § 955 [PHRA]; and the Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.5, Act of July 14, 1961, P.L. § 5. The complaint also alleges a cause of action for breach of contract, breach of the implied covenant of good faith and fair dealing, invasion of privacy, defamation, intentional infliction of emotional distress, and civil conspiracy.

Defendants[1] seek summary judgment on all claims. The standards for summary judgment are not unfamiliar. Under Federal Rule of Civil Procedure 56(c), summary judgment is proper if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." The inquiry for the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). A party opposing summary judgment must marshal sufficient facts to show that there is a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When deciding a motion for summary judgment in an employment discrimination case, the court must decide whether sufficient evidence exists to create a genuine issue of whether an employer intentionally discriminated. *Weldon v. Kraft, Inc.*, 896 F.2d 793, 797 (3rd Cir.1990).

The relationship between the plaintiff and the defendants began in July, 1991, when plaintiff was hired under contract to work for the Kohn firm. He spent most of his time working for Steven Asher, Esquire. At first, things seemed to be working out well. Mr. Asher gave the plaintiff a lot of responsibility and praised his work often. Six months after he arrived, the shareholders voted the plaintiff a $3,500 bonus, $1,000 more than he was expecting. 1992 apparently went well also. Although to terminate the plaintiff's contract, the firm was required to give him ninety days written notice by October 1, it did not do so.

Plaintiff alleges that the situation began to change after the fall of 1992 when he learned that he was HIV-infected. He had a high fever, lost weight, and developed a dry, scaly skin condition. He contacted several physicians. Some members of the firm's support staff wondered aloud whether he had acquired Acquired Immune Deficiency Syndrome [AIDS].

On November 25, 1992, plaintiff received a letter from one of the physicians he had contacted, John Bartlett, M.D. The letter was written on stationery, the letterhead of which contained the words "Infectious Diseases" and "AIDS Services":

Johns Hopkins
MEDICINE

Division of Infectious Diseases
[address]

AIDS Services
[address]

November 25, 1992

Mr. [Doe]
Kohn, Nast & Graf, P.C.
1101 Market St.

---

**1.** Plaintiff is suing both the firm from which he says he was fired, Kohn, Nast & Graf, P.C., and a shareholder of the firm, Steven Asher, Esquire, for whom the plaintiff did most of his work. The invasion of privacy and the defamation claims lie against both defendants. The claims for intentional infliction of emotional distress and civil conspiracy are asserted solely against Steven Asher. All the remaining claims lie against the Kohn firm alone.

Suite 2400
Philadelphia, PA 19107–2924

Dear Mr. [Doe],

This is in response to your letter of November 13, 1992.

I will be glad to see you either here in Baltimore or discuss your case by telephone as we did before. Just let me know how you want to proceed. There is no charge for telephone consultation.

> Sincerely,
> [signature]
> John G. Bartlett, M.D.
> Chief, Division of Infectious Diseases

Pl.'s Ex. 101. The plaintiff contends that just days after he received this letter, defendant Asher stopped assigning him work, stopped speaking with him, and avoided physical contact with him.

In the new year, the Kohn firm did not give the plaintiff a pay raise. On January 13, 1993, Mr. Asher told the plaintiff that he did not meet expectations, and that the firm had decided not to renew his contract for 1994. Pl.'s Ex. 108. Asher memorialized the conversation in a memo to the file, which read in pertinent part:

> I spoke to [Mr. Doe] last week to discuss his status at the firm. I told him that after working with him for roughly eighteen months, I came to the conclusion that his work was substantially below the acceptable level of work required by the firm. I told him that other persons who worked with him apparently shared that evaluation.... I told him that because of our belief that he did not perform at a satisfactory level, and was not likely to progress at the firm, the firm had decided not to renew his contract for the year 1994. He would be permitted to remain with the firm until December 31, 1993. I told him that the problems related entirely to the quality of his written ... work, and not his working relationships with other attorneys and the staff, which appear to be satisfactory.

Pl.'s Ex. 112. Plaintiff disputes the accuracy of this account. Mr. Asher told at least one other member of the firm what was in the memo. The firm did not, however, at that time provide plaintiff with written notice.

Plaintiff alleges that at this juncture the defendants tried to nudge him out by assigning him work that was beneath his abilities, reassigning his secretary to another attorney, taking away his computer, and conducting meetings without including the plaintiff, among other minor and not-so-minor indignities. Plaintiff says he tried to bring his concerns to the attention of the firm management, but they did nothing. Finally, plaintiff contacted an attorney and, on March 8, 1993, sent a box of materials from Kohn, Nast & Graf in Philadelphia to his then-lawyer's office in Washington, D.C. The Kohn firm's administrator asked about the contents of the box. Plaintiff says he avoided a direct answer by jokingly asking "what do you think, a bomb or something?" Shortly after that, she warned the plaintiff that if he sued the firm Harold Kohn and Dianne Nast would blackball him in Philadelphia.

On March 11, 1993, the plaintiff travelled to Washington, D.C. Upon his return to the firm the next day, he found the contents of his office boxed up, and the locks on his office changed. The firm administrator and Harold Kohn demanded that he return his key and office pass. Plaintiff says he was fired; the defendants say he left on his own accord. On August 19, 1993, plaintiff sued both the firm and Steven Asher.

*Americans with Disabilities Act*

With regard to his claims under the Americans with Disabilities Act, counsel for plaintiff has informed the court that he is proceeding on a pretext theory as it relates to the discrimination claim, and a mixed motives theory as it relates to the retaliation claim. Defendants maintain that plaintiff can only proceed on a pretext theory. Which theory applies is significant, because the order and allocation of proofs in employment discrimination cases differ with each theory. The trial court is required to decide whether the case is one of pretext or mixed motives. *Griffiths v. CIGNA Corp.*, 988 F.2d 457, 472 (3rd Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 186, 126 L.Ed.2d 145 (1993).

For the following reasons, I find that there is sufficient direct evidence of retaliation to allow plaintiff to proceed on that claim on a mixed motives theory. Plaintiff's retaliation claim is premised on a violation of section 12203 of the Americans with Disabilities Act, which provides:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203.

The order and allocation of burdens of proof in retaliation cases follow the standards established for Title VII cases generally. *Griffiths,* 988 F.2d at 468. The plaintiff must first establish a prima facie case of retaliation. In a mixed motives case, if the plaintiff is successful in meeting his burden of persuasion, the burden shifts to the defendants, who avoid liability for damages only by establishing an affirmative defense. *Id.* at 469. An employer may be found to have violated the statute where discriminatory reasons were a motivating factor for an employment practice, even though other factors also motivated the practice. 42 U.S.C. § 2000e–2(m).[2]

Defendants contend that summary judgment must be granted on the retaliation claim because plaintiff has failed to establish his prima facie case. The elements of a prima facie case of retaliation are that (1) the plaintiff engaged in protected activity; (2) he was discharged after or contemporaneous with the activity; and (3) a causal link existed between the protected activity and the loss of the job. *Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 501 (3rd Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 376, 116 L.Ed.2d 327 (1991).

The defendants first question whether the plaintiff was engaged in protected activity before the alleged firing. Specifically, defendants suggest that because the plaintiff had yet to file a charge with the Equal Employment Opportunity Commission on March 12, 1993, the date he left the firm, he had not engaged in activity protected by the statute. That, however, is not the test. A threat to sue may suffice. *Id.*[3] It is also the EEOC's position that consulting an attorney regarding one's rights is protected activity under the Act. *EEOC Dec. 84–3,* 34 Lab. Rel.Rep. (BNA) 1887 (1984).

2. Before the passage of the Civil Rights Act of 1991, a mixed motives defendant could "avoid a finding of liability only by proving that it would have made the same decision even if it had not allowed [the forbidden consideration] to play [a motivating] role." *Price Waterhouse,* 490 U.S. at 244–45, 109 S.Ct. 1775, 1787–88. Section 2000e–2(m) of the Act was designed to overrule that part of *Price Waterhouse. Hook v. Ernst & Young,* 28 F.3d 366, 370 (3rd Cir.1994). The section provides in pertinent part:

> an unlawful employment practice is established when the complaining party demonstrates that [the forbidden consideration] was a motivating factor for any employment practice, even though other factors also motivated the practice.

42 U.S.C. § 2000e–2(m).

3. In *Quiroga,* the plaintiff had not filed a complaint with the EEOC. He had, however, hired a lawyer who wrote to the company advising it of his client's claims. *Id.* at 500. After the employer received the letter, it fired him. Although the district court rejected the employee's retaliation claim, and the Third Circuit affirmed, this holding was based on the plaintiff's failure to show the necessary causal link between the protected activity and the loss of his employment, not on a failure to show that he had engaged in protected activity.

In this case, in February, 1993, the plaintiff hired a Washington, D.C. lawyer for representation and advice as to his legal rights. On March 8, 1993, he sent a box containing documents he believed to be pertinent to a discrimination claim to his lawyer. Members of the firm were aware of the box and of the nature of its contents. Based on these factors, I conclude that the plaintiff has met the first element of his prima facie case by showing that he was engaged in protected activity.

■ The defendants next contend that the plaintiff has not met his evidentiary burden with respect to whether the loss of his job was causally linked to the protected activity. In a mixed motives case, the plaintiff meets his burden by showing "direct evidence that an illegitimate criterion was a substantial factor in the decision" to fire him. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 276, 109 S.Ct. 1775, 1804, 104 L.Ed.2d 268 (1989) (O'Connor, J. concurring).[4] At a bare minimum, the plaintiff must show conduct or statements made by a decisionmaker that directly reflects the discriminatory attitude. *Griffiths*, 988 F.2d at 470. Stray remarks made in the workplace by non-decisionmakers, or statements by decisionmakers unrelated to the decisional process itself, do not shift the burden. *Price Waterhouse*, 490 U.S. at 276, 109 S.Ct. at 1804 (O'Connor, J. concurring). Neither do temporally remote comments made by decisionmakers which have nothing to do with the plaintiff's job performance. *Hook v. Ernst & Young*, 28 F.3d 366, 375 (3rd Cir.1994).

Even judging by this stringent standard, I find that there is sufficient direct evidence of a causal connection between the protected activity and plaintiff's loss of employment to raise a genuine issue of material fact. One of the principal shareholders in the firm was aware as early as December, 1992, and perhaps earlier, that the plaintiff was trying to build a case against the firm. Harold Kohn

Dep. at 25, Defs.' Ex. 2. The firm administrator took the plaintiff aside on January 15, 1993, and told him that she "had heard he may see a lawyer or sue the firm, that he should just leave and not make trouble." Doe Dep. at 1155, Pl.'s Ex. 1. She warned him that if he sued, Harold Kohn and Dianne Nast would blackball him so that he never worked again in Philadelphia. Doe Dep. at 1156, 1290, Pl.'s Ex. 1. On the day that the plaintiff sent his box of documents to his lawyer, the Kohn firm administrator inspected the box, and told members of the firm of its contents. A shareholder of the firm, Joseph Kohn, testified that shortly after learning of its contents, the board made a decision to ask the plaintiff for his key and his office pass. Joseph Kohn Dep. at 99–105, Defs.' Ex. 19. From these events, I infer that there is a genuine issue of material fact over whether the defendants' discriminatory motives were directly linked to the loss of plaintiff's job.

This conclusion is supported by Third Circuit cases which state that protected activity by an employee, closely followed by his discharge is some evidence of discriminatory motives. *Jalil v. Avdel Corp.*, 873 F.2d 701, 709 (3rd Cir.1989); *see also Quiroga*, 934 F.2d at 501. The fact that the defendants took away the plaintiff's pass and keys, changed the office locks, and packed up his belongings within four days of learning that he had sent a box of documents to his lawyer, suggests that retaliatory reasons may have led to the parties' parting ways. *Post hoc, ergo propter hoc.*

Defendants disagree and seek to avoid liability by pointing to what they believe are legitimate reasons for their actions. The gist of their argument is that the plaintiff was a disruptive employee, out of control. They state, for example, that he rifled surreptitiously through confidential firm documents, sent a box containing confidential documents to his attorney without the firm's permission,

---

4. The Third Circuit has recognized that use of the term "direct evidence" in this context is somewhat misleading. *Hook v. Ernst & Young*, 28 F.3d 366, 374 & n. 3 (3rd Cir.1994). There is typically no direct evidence because an employer is unlikely to admit that he fired an employee for a discriminatory reason. However, the use of

the term is to distinguish the kind of evidence required in a pretext case from that required in a mixed motives case. In the latter, the plaintiff must point to evidence which directly links the discriminatory motive to the employment action at issue. *Id.; Griffiths*, 988 F.2d at 476.

alarmed the office administrator by telling her that the box contained a bomb, and wrote to the media on firm letterhead in a bid to sell his story. I recognize that there is evidence in the record to support this position. However, there is also evidence to suggest that the real motivation was retaliatory. Accordingly, there is a jury question, and defendants' motion for summary judgment on the retaliation claim shall be denied. Plaintiff may proceed with that claim on a mixed motives theory.

■ Defendants seek summary judgment in their favor on the ADA discrimination count. With respect to this claim, plaintiffs are proceeding on a pretext theory alone. As with mixed motives cases, pretext cases proceed along a pattern of shifting burdens. The plaintiff must first establish a prima facie case. *Griffiths,* 988 F.2d at 469. Under the ADA, the plaintiff must show (1) that he is within the protected class; (2) that he was qualified for the job; and (3) that he was terminated.[5] The quantum of evidence that a plaintiff need show is that the disability "played a role in [defendant's] decision-making process and that it had a determinative effect on the outcome of that process.... [I]t is not necessary for the plaintiff to prove that [the disability] was the sole cause of [defendant's] decision." *Miller v. CIGNA Corp.,* No. 93–1773, 1994 WL 283269, at *1, 1994 U.S.App. LEXIS 16,158, at * 2 (3rd Cir. June 28, 1994); *see also Hazen Paper Co. v. Biggins,* 507 U.S. ——, ——, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338, 347 (1993). The pretext plaintiff may rely on either circumstantial evidence or on direct evidence of discrimination. *Griffiths,* 988 F.2d at 470 (citations omitted).

If the plaintiff meets this burden, the burden shifts to the defendants to articulate a legitimate, non-discriminatory reason for the adverse employment decision. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–55, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981). If the defendants meet their burden, the plaintiff can succeed only if he can show that the employer's evidence is unworthy of credence. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095.

■ Defendants contend that the plaintiff cannot make out his prima facie case because he is not within the protected class. They also contend that the plaintiff was not fired because of discrimination, but because of other legitimate reasons. The thrust of the defense argument is that even though HIV-positive status, most assuredly, is not a happy medical condition with which to be diagnosed, it is not, in fact, disabling. Thus, they say, he is not protected by the statute. The defense argues that plaintiff is able to do just about anything that needs to be done; certainly he is capable of doing that in the context of a law office and courtroom, his chosen line of work, and that here at issue. Occupationally, rather than being disabled, he is perfectly able. To this, the plaintiff responds that his ability to procreate, at least successfully—that is, with uninfected progeny—is impaired irreparably by his malady, and that inability, disability, being a major life activity, brings him within the purview of the statute.

The defense argues that this really is not a relevant concern. Not in any way to be facetious, but plaintiff is not being hired to practice procreation, or to be a professional blood donor, for example. He is being hired to practice law. The defense argues that

---

**5.** Neither the Supreme Court nor the Third Circuit has set out the elements of a prima facie case of discrimination under the Americans with Disabilities Act. However, cases decided under Title VII provide *in pari materia* guidance. Under Title VII, a plaintiff makes out a prima facie case of employment discrimination by showing: (1) that he is within the protected class; (2) that he was qualified for the job; (3) that he was terminated; and (4) that the employer sought a replacement for the plaintiff. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The elements of

the prima facie case will differ depending upon the factual situation in the case. *Id.* at 802 n. 13, 93 S.Ct. at 1824 n. 13. *McDonnell Douglas* was a failure to re-employ case. This is a discriminatory firing case. Were plaintiffs in a discriminatory firing case required, as a threshold matter, to show that the employer sought a replacement for the plaintiff after the dismissal, then employers could fire an employee for a discriminatory purpose yet avoid liability by not seeking a replacement. Hence, element four of the *McDonnell* prima facie case is not applicable here.

although he may have some dysfunction in an utterly unrelated area—a dysfunction familiar to millions of Americans, who happen to be sterile, but who nevertheless go about ably living their lives—to hold that that medical problem makes the Act applicable to him would be to stretch the language and the purpose of the statute beyond the breaking point.

To analyze this, I must turn first to that language. 42 U.S.C. § 12102(2). The statute reads:

> The term "disability" means, with respect to an individual—
>
> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B) a record of such impairment; or
>
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).

■ This plain language, although setting forth several specific criteria, provides no express guidance as to whether an HIV-infected person comes within the ambit of the Act. In interpreting the meaning of a statute, substantial deference is due the interpretation given its provisions by the agency charged with administering that statute. *Thomas Jefferson Univ. v. Shalala,* —— U.S. ——, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994). The agency's interpretation must be given "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Id.,* (citing *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)). Hence, for further guidance, I turn to the regulations defining the components of this statutory provision—(1) physical impairment and (2) substantially limits a major life activity.

*Physical Impairment:* The Equal Employment Opportunity Commission is the agency charged with administering Title I of the Americans with Disabilities Act, the subchapter proscribing employment discrimination. Its regulations define "physical impairment" as:

> Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine.

29 C.F.R. § 1630.2(h).

"Physiologic" is defined by Dorland's Medical Dictionary (27th ed. 1988) as "characteristic of or conforming to the normal functioning or state of the body or a tissue or organ." A physiological disorder is thus an abnormal functioning of the body or a tissue or organ. One can have one of the statutorily enumerated disabilities without being "disabled" in the usual, common, lay sense of the word. For example, the statute would apply to people who have high blood pressure, that being a hemic disorder, a proclaimed disability. Tens of millions of Americans walk around and live full and active lives, hypertense though they may be. To the lay eye, they hardly seem disabled, yet they have a "disability" within the statutory definition. That lay observation may have a certain common sense ring to it, but my role is not to construe the statute so that it might conform with a lay perception.[6] Rather, I must read with care the definitions of disability that

---

**6.** It is, perhaps, a somewhat strained analogy, but if one hearkens back to one of the most familiar of our laws, the statutory prohibition on "drunk driving", one observes a similar divergence between statutory standard and lay perception. "Drunk driving" is what people have been calling that provision, virtually since its enactment. In point of fact, the statute, of course, has various specific criteria whereby one is sufficiently alcoholically disabled that one is statutorily deemed incapable of safe driving. Many of the defined standards fall far short of what a lay person would call "drunk". Thus, one need not be disablingly "drunk" in order to break that law. A ten per cent blood-alcohol readout is sufficient to fall within the statutory definition in Pennsylvania. *See* 75 Pa.C.S. § 3731(a)(5) (Supp.1994). In some states it is less. The lay view of what the law means must give way to what the law says it means.

Similarly, I have encountered many citizens who were surprised, indeed, to discover that the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.,* defines as falling within its protected class, those who, but a day before, were the relatively tender age of 39. If Congress chooses to proclaim them sufficiently aged to fall within that act's protection, then that's the way it is.

Congress and the EEOC, gave us, and decide whether this plaintiff's disease and its symptoms fall within one or more of those express statutory and regulatory definitions, as anomalous as the statutory result might seem to some.

Around the third week of September, 1992, plaintiff developed a fever and a rash. Braffman Dep. at 50–51, Defs.' Ex. 24. During September through December, 1992, plaintiff's doctor noticed that his patient lost a lot of weight. Braffman Dep. at 27, 119–120, Defs.' Ex. 24. Towards the end of October and into November, plaintiff's skin became so dry and scaly that at least three people in the firm took note of it. Barretta Dep. at 43, Defs.' Ex. 8; Aberman Dep. at 57, Defs.' Ex. 9, Santiago Dep. at 123, Defendants' Ex. 20.

A fever is an "elevation of body temperature above the normal [which] may be due to such physiological stress as ... excess thyroid hormone secretions, vigorous exercise, central nervous system lesions, or to infection by microorganisms, or to a host of noninfectious processes...." Dorland's Medical Dictionary (27th ed. 1988). It could involve a physiological disorder of any one of the body systems listed in the Department of Labor regulations. A skin disorder which is sufficiently noticeable to be remarked upon by several people is classifiable as a cosmetic disfigurement. Further, HIV itself "creates a physiological disorder of the hemic (blood) and lymphatic systems." *Cain v. Hyatt*, 734 F.Supp. 671, 679 (E.D.Pa.1990) (citing *Doe v. Dolton Elem. Sch. Dist. No. 148*, 694 F.Supp. 440 (N.D.Ill.1988)) (describing in detail the effects of HIV infection on the body). Dr. Braffman, plaintiff's physician, testified that in late September, 1992, "a few lymph nodes in the neck" were swollen, although not visible to the naked eye. Braffman Dep. at 50–51, Defs.' Ex. 24. Each of these symptoms fall within the regulatory definition of "physical impairment".

*Substantial limits on major life activities:* The regulations spell out "major life activities" as:

> [F]unctions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

29 C.F.R. § 1630.2(i). The use of the words "such as" indicates that this list is illustrative and is not intended to be exclusive. 29 C.F.R. § 1630.2(i), EEOC Regulations, Appendix to Part 1630—Interpretative guidance on Title I of the ADA. In construing the statute, trying to figure out just what it means, I deem it significant that the Congress chose to use the broad term "life"— "major life activities". That encompasses a lot. Had the term "work-life", or "work" been used—"major work activities", for example—it would, of course, suggest that the disability would only be deemed relevant in the on-the-job context. Instead, the term "working" appears as just one example of the various major activities embraced within the full scope of one's life. It is clear, therefore, that the language of the statute does not preclude procreating as a major life activity, but may well include it.[7]

---

7. This reading is also supported by legislative history. Legislative history, although it can be, at times, misleading, may be properly viewed as indicative of congressional intent. *Blum v. Stenson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984); *see also Negonsott v. Samuels*, — U.S. —, 113 S.Ct. 1119, 122 L.Ed.2d 457 (1993).

In the case of the ADA, several legislators commented directly upon the issue of whether asymptomatic HIV-positive people are protected by the Act. Congressman Owens of New York: People with HIV disease are individuals who have any condition along the full spectrum of HIV infection-asymptomatic HIV infection, symptomatic HIV infection or full blown AIDS. These individuals are covered under the first prong of the definition of disability in the ADA....

136 Cong.Record H4623 (daily ed. July 12, 1990). Senator Kennedy of Massachusetts, co-sponsor of the bill, agreed, 136 Cong.Rec. S9696 (daily ed. July 13, 1990), as did Representative Waxman:

As medical knowledge has increased, specialists in the field increasingly recognize that there exists a continuum of disease among those who are HIV infected. All such individuals are covered under the first prong of the definition of disability in the ADA.

136 Cong.Rec. H4646 (daily ed. July 12, 1990).

There is also evidence of some congressional opposition to ADA protection for HIV-infected people. Several senators supported an amendment which gave food handlers the right to refuse to assign an employee with an infectious or communicable disease to a job involving food handling. 136 Cong.Rec. H2478 (daily ed. May

A major life activity is substantially limited when an impaired person is:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j).

Plaintiff argues that because the regulations define a "physical impairment" to include a disorder or condition that affects the "reproductive" system, 29 C.F.R. § 1630.2(h), the ability to procreate is a "major life activity" within the plain meaning of the ADA. The factual record in this case is thin, indeed, as to whether HIV status is a disorder or condition that affects the "reproductive" system. No physicians testified as to that, and the parties seemed content to rely on administrative findings and the rulings of other judges such as that given in *Cain v. Hyatt*, 734 F.Supp. 671 (E.D.Pa.1990). That was a

case involving a plaintiff with full-blown AIDS, in which Judge Broderick found in dictum that a person who is HIV-infected is substantially limited in a major life activity because of the significant risk of transmitting the HIV infection to a partner or a child, thereby endangering their lives. *Id.* at 679.

The defendants' motion for summary judgment is bottomed largely upon the thesis that plaintiff's illness falls without the types of disability defined, described, and illustrated in the statute and the regulations. Nothing in the record—no evidence, medical or otherwise—counters the above statutory construction, reinforced by administrative and judicial findings, that being HIV-positive places one within the protection of the Act. Upon a careful reading of the Act and its interpretive regulations, measured up against the record in this case, I conclude the plaintiff has a physical or mental impairment that substantially limits one or more of his major life activities, and thus has a disability within the meaning of the ADA. 42 U.S.C. § 12101(2)[8]. Accordingly, plaintiff has met his threshold burden of establishing his prima facie case of disability discrimination.[9]

---

17, 1990). Although it made no specific mention of HIV-infected workers, the intent behind the amendment was to allow restaurateurs to pull HIV-infected workers from food handling activities. 136 Cong.Rec. H2478 (daily ed. May 17, 1990). The amendment passed the House, but was eliminated in conference committee. Efforts to reinstate it were unsuccessful.

8. This reading of the statutory language is reinforced by the interpretations given the statute by the Justice Department, which is called upon to enforce Titles II and III of the Act. Title II prohibits public entities from discriminating against qualified individuals with regard to services, programs, or any other of its activities. 42 U.S.C. § 12132. Title III prohibits the owner, lessors, or operators of a place of public accommodation from discriminating on the basis of disability with regard to the use of those facilities. 42 U.S.C. § 12182. Justice Department regulations for Titles II and III conclude that "asymptomatic HIV disease is an impairment that substantially limits a major life activity, either because of its actual effect on the individual with the disease or because the reactions of other people to individuals with HIV disease cause such individuals to be treated as disabled." 28 C.F.R. § 35.104; 28 C.F.R. § 36.104. I perceive no basis for applying a different standard for admissibility into the protected class in the con-

text of public accommodation and public services, than in the context of employment.

9. The Supreme Court has yet to address whether an individual with HIV could ever qualify as a disabled person. In *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 282 n. 7, 107 S.Ct. 1123, 1128 n. 7, 94 L.Ed.2d 307 (1987), the United States argued in an amicus brief that it is possible for a person with AIDS to be a carrier of the disease, yet not have a "physical impairment" within the meaning of the Rehabilitation Act. Because resolution of the issue was not necessary to its decision, the Court declined to address it.

However, at least two cases have since addressed the issue, and concluded that an asymptomatic HIV infected individual is within the protected class. In *Doe v. District of Columbia*, 796 F.Supp. 559 (D.D.C.1992), the parties stipulated, and the Court did not challenge that stipulation, that an asymptomatic HIV-infected firefighter was an "individual with a handicap" within the meaning of the Rehabilitation Act because he had a "physical impairment that substantially limits major life activities such as procreation, sexual contact, and normal social relationships." *Id.* at 568 (citing *In re Westchester County Medical Center*, 2 Emp.Prac.Guide (CCH) ¶ 5340 at 6999–318 (Apr. 20, 1992) (in which an administrative law judge for the Department of

■ In addition to proceeding on the theory that he has a disability within the meaning of the Act, the plaintiff also seeks to proceed on the theories that he has a record of impairment and that he was regarded as having an impairment.

The court finds that he does not have a record of impairment. A "record of such impairment" means a "history" of the condition. 29 C.F.R. § 1630.2(k). In *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987), the Supreme Court found that the plaintiff had a record of impairment because she had a history of tuberculosis. She was initially diagnosed with the disease in 1957, but it went into remission and did not return until twenty years later when she was a teacher in Nassau County. *Id.* at 276, 107 S.Ct. at 1125. The board fired her after three relapses in two years. The Court found that the plaintiff's 1957 hospitalization for tuberculosis sufficed to establish that she had a "record of impairment", and that she was therefore a handicapped individual within the meaning of section 504 of the Rehabilitation Act. *Id.* at 281, 107 S.Ct. at 1127. Because the ADA borrowed wholesale the provisions of section 504 to define what was meant by a "disability", the holding is applicable to the case at bar. Mr. Doe was not diagnosed with HIV until September 1992; it was that diagnosis which led to the events that form the basis for this suit. In my view, that is not a long enough record to constitute a history of impairment. His disease was virtually brand new. Accordingly, I hold that he does not have a record of impairment.

■ The third possible theory of liability under the ADA is not whether the plaintiff actually had an impairment, but whether he was regarded as having an impairment. If he was, that is enough. The expression is reasonably self-defining, but the regulations give greater specificity. Plaintiff is regarded as having an impairment if he:

(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;

(2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others towards such impairment; or

(3) Has none of the impairments defined [above] but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. § 1630.2(*l*).

Defendants contend that the only evidence of perception of impairment in the record is that three people in the Kohn firm had heard or spread rumors that plaintiff was HIV-infected. The first two were the plaintiff's secretary and Mr. Asher's secretary. The plaintiff's secretary testified that she remembered discussing with Mr. Asher's secretary whether the plaintiff had AIDS, Karas Dep. at 52, Defs.' Ex. 10, a conversation which Mr. Asher's secretary confirmed. Barretta Dep. at 51, Defs.' Ex. 8. The third person was a member of the support staff, who testified that he had heard a discussion in a lunch room crowded with support staff, but with no lawyers. Harris Dep. at 22–23, Defs.' Ex. 11.

There is other evidence that there may have been a perception even in the higher echelons of the Kohn firm management that plaintiff was infected. In October, 1992, the plaintiff contacted John Bartlett, M.D., of Johns Hopkins University AIDS Services, about treatment with the drug AZT. Dr. Bartlett wrote back on Johns Hopkins stationery which, as mentioned *supra*, contained in the left-hand corner the words "AIDS Services". During the discovery phase of this case, the letter was found in the "personal file" of Steven Asher, a secretary in the firm having opened it as of course. Defendants argue that the letter is innocuous, not susceptible of suggesting to the casual reader that the plaintiff had the sort of medical problem that this case discusses. On the contrary, not to put two and two together upon reading that letter would require unusual opaqueness of vision. The defendants

Health and Human Services held that an HIV-infected pharmacist was an individual with a handicap under the Rehabilitation Act even though he was asymptomatic)); *see also Cain v. Hyatt*, 734 F.Supp. at 679 (discussed *supra*).

in this case are not dumb, and to miss that inference, one would have to be.

Nevertheless, defendants articulate a litany of legitimate reasons why plaintiff was fired, including allegations that he just was not up to the job. In contrast, Mr. Doe portrays himself as on the "fast-track to being a shareholder." Pl.'s Mem. in Opp. to Defs.' Mot. for Summ. J. at 14. Both sides present evidence in support of their contentions. Viewing the facts in the light most favorable to the plaintiff, I conclude that this, too, is a matter for the jury, the right to which I may not thwart.[10] Accordingly, defendants' motion for summary judgment, as to the retaliation and discrimination claims under the Americans with Disabilities Act claims, shall be denied.

*Pennsylvania Human Relations Act*

■ The Pennsylvania Human Relations Act, 43 Pa.S. § 955 [PHRA], which was modelled after Title VII, is analyzed the same as Title VII cases. That analysis achieves the same result as the ADA claim.

*ERISA*

■ The plaintiff claims, under section 510 of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1140, that one of the determining factors in defendants' decision to terminate him was their desire to deprive him of participation in the Kohn firm's disability program. Under the terms of his contract, plaintiff would have become vested in the program on July 22, 1993, shortly after he left the firm.

Section 510 provides in pertinent part:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan....

29 U.S.C. § 1140. The definitional section of ERISA describes an "employee benefit plan" as an "employee welfare benefit plan" which, in turn, the statute defines as "any plan, fund, or program ..., established or maintained by an employer ... to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants ... *disability* ... benefits." 29 U.S.C. § 1002 (emphasis added). Because the Kohn firm's disability plan fits within this description, plaintiff's interest in the plan comes under the protective umbrella of ERISA.

When a violation of section 510 can only be proved by circumstantial evidence, as appears to be the case here, the plaintiff's claim must be assessed by using the scheme of shifting burdens developed in Title VII cases. *Kapetanovich v. Rockwell Int'l, Inc.*, No. 92–3018, 1994 WL 530912, at *2, 1992 U.S.App. LEXIS 36,785, at *7–8 (3rd Cir. July 15, 1992). Under this scheme, the employee has the burden of making out a prima facie case of discrimination. *Gavalik v. Continental Can Co.*, 812 F.2d 834, 852 (3rd Cir.), *cert. denied*, 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). The plaintiff does so by showing that (1) he belonged to the protected class (2) he was qualified for the position involved, and (3) was discharged under circumstances that provide some basis for believing that the prohibited intent was present. *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 347 (3rd Cir.1990). The plaintiff must show that the employer made a conscious decision to interfere with his disability benefits and that the desire to prevent his benefits from vesting was a "determinative factor" in its decision. *Id.* As with Title VII cases, once the plaintiff establishes his prima facie case, the burden of production shifts to the defendants to show a legitimate, non-discriminatory purpose for their actions. *Kapetanovich*, 1994 WL 530912, at *2, 1992 U.S.App. LEXIS 36,785, at *7–8. If the

---

10. The briefs contain some argument regarding plaintiff's charges of interference, intimidation, and coercion, under section 12203(b) of the Americans with Disabilities Act. This claim is made in the Second Amended Complaint. However, it is absent from the First Amended Complaint, which is the subject of this summary judgment motion. Hence, it would be inappropriate for me to address that claim at this juncture.

employer carries its burden, the plaintiff wins only if he can demonstrate that the articulated reason was pretextual. *Id.*

As for the first two factors of the prima facie case, the plaintiff, as a potentially vested member of the firm's disability program, was a protected individual. So also is he qualified for the position involved, being a lawyer, and one apparently experienced in the particular kinds of cases the Kohn firm handled.

As for the third factor, ERISA-illicit intent, defendants argue strenuously that the record is devoid of any evidence that they fired the plaintiff with the intent of depriving him of disability benefits. Defendants say the Kohn firm board decided not to renew plaintiff's contract at a meeting on December 15, 1992, and that they agreed to allow the plaintiff to continue to work at the firm beyond the date on which he would have become vested in the firm's disability plan.

Plaintiff questions whether the December, 1992, meeting ever took place. Even if it did, and the board decided at that time to fire him, they did not inform him of that fact in writing as required by the terms of his contract. Furthermore, regardless of that meeting's decision, there is evidence to suggest that the firm actually terminated the plaintiff on March 12, 1993, the day they boxed up his belongings and changed the locks on his office door. Whether they did so, and whether they did so with an intent to stop him from vesting in the disability plan, presents genuine issues of material fact, unresolvable on a motion for summary judgment.

Furthermore, there is evidence in the record which could be read to suggest that the defendants' motives were less than licit. Mr. Asher kept a personal file, into which he placed personal letters and documents. Sometime in February, 1993, Mr. Doe discovered in this file a copy of his résumé and, next to it, a copy of a document entitled "disability income proposal for [Mr. Doe]." Pl.'s Ex. 64. The file normally contained only Mr. Asher's personal correspondence. This entry—coming shortly after the high-fever incident, after the rash, and after the letter from Dr. John Bartlett marked "AIDS Services" had been delivered—evidences sufficient circumstances to show that the defendants may have made a conscious decision to interfere with the vesting of Mr. Doe's disability plan. Accordingly, defendants' request for summary judgment on the ERISA count shall be denied.

*Breach of Contract*

■ Count four of plaintiff's claim alleges that defendants breached their employment contract with the plaintiff by firing him without the contractually required written notice, Defs.' Ex. 36, by failing to pay plaintiff the salary he was due under the contract, and by breaching unspecified implied promises made orally to the plaintiff at the time he was hired.

■ The parol evidence rule requires that the claims based upon oral implied promises be dismissed. *Mellon Bank Corp. v. First Union Real Estate Equity & Mortg. Inv.*, 951 F.2d 1399 (3rd Cir.1991) (citing *Gianni v. R. Russel & Co.*, 281 Pa. 320, 126 A. 791 (1924)).

As for the remaining contract claims, they survive this motion. Paragraphs 2 and 12 of the employment agreement provide as follows:

2. *Salary:* The Corporation shall pay to the Employee as compensation for Employee's services a salary at the rate of $65,000 per year, payable in bi-weekly installments of $2,500.

12. *Termination of Employment:* Either the Corporation or the Employee may terminate this agreement as of December 31 of any year, by delivery of written notice of such termination to the other party at least ninety (90) days prior to December 31.

According to the terms of the contract, if the Kohn firm had wanted to terminate plaintiff in 1993, they would have had to provide him with written notice by October 1, 1992. They did not. Defendants do not dispute this. They maintain, however, that they did send by certified mail, both to his home address and to his post office box, such written notice on September 27, 1993, in time to provide him with contractually correct notice that they no longer required his services

as of the first day of 1994. Plaintiff says he did not get the notice sent to his home until October 4th. And it was on October 6th that he went to the post office and signed a receipt for the copy sent to his post office box. Pl.'s Ex. 157. In either case, the notice came after the deadline of October 1, 1992.

On the other hand, at that point, the technical niceties of written notice may have been punctilious *ad absurdum.* The record suggests that defendants had fired plaintiff long before they sent him written notice on September 27, 1993. Again, after defendants locked plaintiff out of his office, boxed up his chattels, and cut off his paycheck, all in March of that year, formal notice of contractual terminus would have had overtones of the redundant.

*Breach of Covenant of Good Faith and Fair Dealing*

■ Plaintiff also claims that the defendants breached the implied covenant of good faith and fair dealing. The general duty of good faith and fair dealing in the performance of a contract is found in Restatement (Second) of Contracts § 205, which provides that "every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *See also Somers v. Somers,* 418 Pa.Super. 131, 613 A.2d 1211, 1213 (1992). The duty of "good faith" is defined by statute as "[h]onesty in fact in the conduct or transaction concerned." 13 Pa.C.S. § 1201. Examples of conduct which breaches the duty include evasion of the spirit of the bargain, and interference with or failure to cooperate in the other party's performance. *Id.* The duty to perform contractual obligations in good faith applies where the contract at issue is an employment contract. *Id.*

Defendants' position is that they acted in the utmost good faith by giving the plaintiff ample notice that they would not be renewing his contract, thereby providing him with sufficient time to find a new job. Under the defendants' theory of events, they were willing to keep the plaintiff on at the firm until the end of 1993. They contend that the plaintiff, upon seeing his belongings packed up and the locksmiths at the doors, erroneously concluded that he was being terminated. Even accepting this theory on its face, there is sufficient evidence to suggest that the defendants breached their duty to act in good faith. Barring an attorney from access to two of the crucial tools of his trade—his office and his papers—is readily construable as an interference with, or at the very least a failure to cooperate in, the performance of his contractual obligations. Accordingly, the count for breach of the implied covenant of good faith and fair dealing shall remain in the case.

*Pennsylvania Wage Payment and Collection Law*

■ Plaintiff's claim under the Pennsylvania Wage Payment and Collection Law is that the Kohn firm has not paid him for two earned, but unused, vacation days in 1992, or for his prorated earned, but unused, vacation time for 1993. The law reads in pertinent part:

> Whenever an employer separates an employe from the payroll, or whenever an employe quits or resigns his employment, the wages or compensation earned shall become due and payable not later than the next regular payday of his employer on which such wages would otherwise be due and payable. If requested by the employe, such payment shall be made by certified mail.

43 P.S. § 260.5, Act of July 14, 1961, P.L. § 5 [WPCL].

■ The WPCL does not create a statutory right to compensation. Rather, it provides a statutory remedy when the employer breaches a contractual right to earned wages. Whether specific wages are due is determined by the terms of the contract. *Weldon,* 896 F.2d at 800 (citations omitted). Vacation pay owed under the contract upon termination is covered by the Act. *Hamilton v. Air Jamaica, Ltd.,* 750 F.Supp. 1259, 1271 (E.D.Pa.1990), *rev'd on other grounds,* 945 F.2d 74 (3rd Cir.1991).

With respect to vacation time, the plaintiff's contract with the Kohn firm provided only that "[t]he Employee shall be entitled to such vacation as is authorized by the Corporation from time to time." Defs.' Ex. 36. Defendants contend that because the con-

tract provides no set vacation time, no vacation pay is due.

Plaintiff does not contest that the contract's vacation clause is nonspecific. Rather, he maintains that the Kohn firm had an established, but unwritten, policy of allowing each associate twenty days paid vacation per year which, if unused, they could carry over to the next year. As evidence of that policy, he supplies two memoranda from him to senior members of the firm which are about unused vacation days. The first memorandum states: "I *assume* that I will be able to defer the remaining two days until next year." Pl.'s Ex. 156 (emphasis added). The second states: *"It is my understanding* that ... I will be permitted to use the two remaining days during January." Pl.'s Ex. 157 (emphasis added). The plaintiff received no response, or, at least, one is not found in the record. While silence in the face of the plaintiff's asserted assumptions regarding vacation policy may, in some instances, be tantamount to a tacit admission that the policy existed, that is not the case here. Whatever the plaintiff's beliefs were with respect to his vacation days, they fell outside the four corners of the contract. Without a contractual provision, Pennsylvania's Wage Payment and Collection Law does not apply. Hence, I shall grant the motion for summary judgment with respect to this claim.

*Invasion of Privacy*

██ Plaintiff also asserts a claim of invasion of privacy. He alleges that Steven Asher searched through personal medical documents on his desk, read the documents, and that Asher disseminated the information learned from those documents. Plaintiff alleges that these acts constituted tortious intrusion upon his seclusion.

██ The tort of intrusion upon seclusion, which is set forth in section 652B of the Restatement (Second) of Torts, provides that:

One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of privacy, if the intrusion would be highly offensive to a reasonable person.

A defendant will be found to have intentionally intruded on a plaintiff's privacy only if he believed, or was substantially certain that he lacked the necessary legal or personal permission to commit the intrusive act. *O'Donnell v. U.S.*, 891 F.2d 1079, 1083 (3rd Cir. 1989). Furthermore, the intrusion must be substantial, and highly offensive to the reasonable person. *Borse v. Piece Goods Shop, Inc.*, 963 F.2d 611, 621 (3rd Cir.1992). A search of an employee's workplace which is done in such a way as to reveal matters unrelated to the workplace, may constitute tortious invasion of the employee's privacy. *Id.* (citations omitted).

Although there is no direct evidence that Mr. Asher searched the plaintiff's office, there is some circumstantial evidence to suggest that he did. The jury must decide how a copy of the Bartlett letter—the letter from a physician in AIDS Services at Johns Hopkins University to the plaintiff—made its way from the plaintiff's office to Steven Asher's personal file. And, if they conclude that Steven Asher found it during a casual search of the plaintiff's office, they must then decide whether the intrusion on plaintiff's privacy was substantial and whether Mr. Asher's actions were highly offensive to the reasonable person.

*Defamation*

██ Plaintiff's defamation claims are premised on two incidents. The first concerns the memorandum that Steven Asher wrote to the file about the plaintiff's lawyering skills. Plaintiff says that defendants showed it to other people in the firm, and also told people about its contents.[11] The second concerns statements allegedly made by the defendants to firm employees to the

---

11. The pertinent portion of the memorandum states:

> I spoke to [Attorney Doe] last week to discuss his status at the firm ... I told him that ... his work was substantially below the acceptable level of work required by the firm.... [Attorney Doe's] problem relates entirely to the quality of his work, written work and not his working relationships with other attorneys and the staff, which appear satisfactory.

Compl. ¶ 26.

effect that they fired the plaintiff after finding confidential documents in his office.

The burden of proof on a plaintiff seeking recovery for defamation in Pennsylvania is codified. 42 Pa.C.S. § 8343.[12] Publication of the allegedly false statement is one of the necessary elements of the tort of defamation. *Lekich v. Int'l Bus. Machs. Corp.*, 469 F.Supp. 485 (E.D.Pa.1979).

With respect to the memorandum, and the dissemination of its contents, I find that it was published to Dianne Nast, but to no one else. All of the support staff denied seeing the memo or hearing about its contents from anyone other than the plaintiff himself. Aberman Dep. at 81, Defs.' Ex. 9; Anderson Dep. at 86, Defs.' Ex. 7; Baretta Dep. at 73–76, 115, Defs.' Ex. 8; Cooley Dep. at 85–86, Defs.' Ex. 23; Cannon Dep. at 86, Defs.' Ex. 22; Dillon Dep. at 138, Defs.' Ex. at 13; Fornia Dep. at 26, Defs.' Ex. 21; Harris Dep. at 49, Defs.' Ex. 11; Karas Dep. at 100, Defs.' Ex. 10; Williams at 40, Defs.' Ex. 12. One shareholder did see a copy of the memorandum attached to a copy of either the complaint or the amended complaint in this litigation, but that was the first knowledge he had of it. Croner Dep. at 100, Defs.' Ex. 6. The record shows that the only person who says she knew of the contents of the memorandum, apart from in connection with this litigation, is shareholder Dianne Nast. Nast Dep. at 146–148, Defs.' Ex. 4.

 This publication does not, by itself, support plaintiff's defamation claim. The law in Pennsylvania is that allegedly defamatory statements are absolutely privileged when published by an employer to those with a legitimate interest in the subject matter when made in connection with an employment termination. *Sobel v. Wingard*, 366 Pa.Super. 482, 531 A.2d 520, 522 (1987); *DeLuca v. Reader*, 227 Pa.Super. 392, 323 A.2d 309, 313 (1974). This privilege also

accompanies warning letters such as the memorandum at issue here. *Agriss v. Roadway Express, Inc.*, 334 Pa.Super. 295, 483 A.2d 456, 464 (1984). However, the privilege is lost where it is abused. *Daywalt v. Montgomery Hosp.*, 393 Pa.Super. 118, 573 A.2d 1116 (1990). And, whether it was here, is a question of fact for the jury. *Agriss*, 483 A.2d at 463 (citing *Montgomery v. Philadelphia*, 392 Pa. 178, 140 A.2d 100 (1958)). Accordingly, I shall not grant summary judgment on this defamation claim.

 Neither is summary judgment appropriate with respect to plaintiff's allegations that the defendants defamed him by telling others that he left because he had misappropriated confidential documents. In Pennsylvania, the dismissal of an employee for theft can constitute a communication that the employee was a thief, and support a cause of action for defamation. *Paul v. Lankenau Hosp.*, 375 Pa.Super. 1, 543 A.2d 1148, 1158 (1988). In some instances, mere conduct, without a verbal communication to the effect that the dismissed employee was a thief, may support a suit in slander. *Berg v. Consolidated Freightways, Inc.*, 280 Pa.Super. 495, 421 A.2d 831, 834 n. 1 (1980).

In this case, some firm employees testified that they heard the plaintiff was fired because confidential documents were found in his office. Aberman Dep. 106, Defs.' Ex. at 9; Fornia Dep. at 77–78, Defs.' Ex. 21. Furthermore, the actions of the firm's key personnel on March 12, 1993, the day plaintiff left the firm, can be read to suggest that the plaintiff was fired because he was dishonest, perhaps a thief. On that day, when plaintiff came to work he found that his secretary, acting on the instructions of the firm administrator and Harold Kohn, had packed the contents of his office into boxes. Petrovic Dep. at 196–98. Those boxes which his secretary believed belonged to the firm, she sent

---

**12.** In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised:

(1) The defamatory character of the communication.

(2) Its publication by the defendant.

(3) Its application to the plaintiff.

(4) The understanding by the recipient of its defamatory meaning.

(5) The understanding by the recipient of it as intended to be applied to the plaintiff.

(6) Special harm resulting to the plaintiff from its publication.

(7) Abuse of a conditionally privileged occasion.

42 Pa.C.S. § 8343.

to the file room. *Id.* Harold Kohn asked plaintiff to give up his building pass and key. *Id.* Shortly afterwards, the firm administrator ordered the locks changed on the firm's doors. I leave it to the jury to draw what inferences they will from this sequence of events.

*Civil Conspiracy*

Plaintiff makes out the two remaining claims—civil conspiracy and intentional infliction of emotional distress—solely against Steven Asher. Civil conspiracy in Pennsylvania requires that "two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means." *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d 466, 472 (1979).

It is, indeed, the general rule in Pennsylvania that a corporation cannot conspire with itself, *Thompson Coal Co.*, 412 A.2d at 473, nor with its officers and agents when they act solely for the corporation and not on their own behalf. *Johnston v. Baker*, 445 F.2d 424, 426 (3rd Cir.1971). However, a corporation can conspire with its agents or employees if the agents or employees are acting not for the corporation, but for personal reasons, and one of the parties to the conspiracy is not an agent or employee of the corporation. *Johnston*, 445 F.2d at 426–27. This rule has been read expansively to allow a claim for civil conspiracy to go forward where agents or employees act outside of their roles as officers and employees of the corporation even in the absence of a co-conspirator from outside the corporation. *Sanzone v. Phoenix Technologies, Inc.*, No. 89–5397, 1990 WL 50732, at *10–11, 1990 U.S.Dist. LEXIS 4656, at *33 (E.D.Pa. Apr. 18, 1990); *Denenberg v. American Family Corp.*, 566 F.Supp. 1242, 1253 (E.D.Pa.1983); *O'Neill v. ARA Services, Inc.*, 457 F.Supp. 182, 188 (E.D.Pa.1978).

Here, there is evidence to suggest that Mr. Asher was acting outside of his role in the firm. Before the series of events in fall 1992, the plaintiff and Mr. Asher appeared to have a good working relationship. Mr. Asher worked closely with the plaintiff and frequently complimented him on his work. The compliments kept on coming until as late as December 14, 1992, when Asher left a note on plaintiff's desk which read "good job on the lumber motion! I sent it as is." Asher Dep. at 413–14, Defs.' Ex. 3, Barretta Dep. at 60–61, Defs.' Ex. 8.

But, plaintiff's status abruptly changed. Soon after the note, Mr. Asher says he told Harold Kohn and Dianne Nast, shareholders at the firm, that he was disappointed with the plaintiff's work hours, progress as a lawyer, and the quality of his work product. Asher Dep. 40–41, Defs.' Ex. 3. On January 18, 1993, Mr. Asher wrote a letter to the file to the effect that plaintiff's work was "substantially below the acceptable level of work required by the firm." Pl.'s Exs. 112, 113.

Something happened to make Mr. Asher change his opinion of the plaintiff. He may have heard of the rumors that the plaintiff was infected. He may have seen the letter from Dr. Bartlett with "AIDS Services" written in the corner. There is enough evidence in the record to raise an inference that at some point he learned of the plaintiff's HIV status and conspired to get him out of the firm. I thus conclude that there is a genuine issue of material fact over whether Steven Asher acted for the firm or for himself.

*Intentional Infliction of Emotional Distress*

The claim for intentional infliction of emotional distress now lies against defendant Steven Asher, only. Under Pennsylvania law, a claim for intentional infliction of emotional distress is viable only if premised on conduct which is "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community...." *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3rd Cir.1988) (citing *Rinehimer v. Luzerne County Community College*, 372 Pa.Super. 480, 539 A.2d 1298, 1305 (1988)). It is for the court to determine, as a preliminary matter, whether the conduct is so extreme as to permit recovery. *Id.* (citing Restatement (Second) of Torts § 46 comment h). In *Cox*, the Third Circuit upheld the trial court's directed verdict in favor of the defendant on the plaintiff's claim for intentional infliction of emotional distress. In that case, the de-

fendant had fired the plaintiff on the day that he returned to work on a part-time basis following triple bypass surgery. *Id.* at 391. Reading the facts in the light most favorable to the plaintiff, the Third Circuit assumed that the plaintiff had undergone the surgery, that he was returning to work on a trial basis, that his physical and emotional recuperation were not complete at the time he was let go, and that the defendant knew that, by firing the plaintiff, it was endangering his chances of collecting medical and disability benefits. *Id.* at 395. The court found, nevertheless, that the defendant could only be said to have dismissed the plaintiff with an "improper motive" and that they did not rise to the level of outrageousness necessary under Pennsylvania law. *Id.* at 396. The court reached its decision in part because of the great reluctance of Pennsylvania courts to allow recovery for the intentional infliction of emotional distress in the employment context. *Id.* at 394.

Plaintiff suggests that defendant Steven Asher acted in an outrageous manner by failing to renew the plaintiff's contract for 1994 because he believed him to be HIV-positive, and that he did so in various ways: by disseminating false and defamatory information to conceal his discriminatory purpose; by taking steps to force the plaintiff to voluntarily leave the firm; and then, by retaliating against him by abruptly terminating him on March 12, 1993, and threatening to forcibly remove him from the premises of Kohn, Nast & Graf. Even if the jury were to find all this to be the case, it would establish only that the defendant's role in the plaintiff's firing stemmed from an "improper motive" which is not sufficient under *Cox* to support a claim of intentional infliction of emotional distress. *See also Doe v. William Shapiro, Esquire, P.C.,* 852 F.Supp. 1246 (E.D.Pa.1994).

*Punitive Damages*

■ Finally, defendants contest plaintiff's claim that he is entitled to punitive damages under the ADA, the PHRA, the invasion of privacy, the defamation, the civil conspiracy, the breach of contract and the breach of the duty of good faith and fair dealing counts. With respect to the contract claims, plaintiff has conceded that punitives do not lie as to

contracts. Tr. of July 11, 1994 at 106–107. Defendants' quarrel over punitives for the remaining counts is that their behavior was not sufficiently egregious to warrant their imposition. That is an issue of fact for the jury.