

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-12-1995

# Ortiz v Rental Management Inc

Precedential or Non-Precedential:

Docket 95-5035

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Ortiz v Rental Management Inc" (1995). *1995 Decisions*. Paper 252.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/252

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Nos. 95-3027, 95-3045


DUQUESNE LIGHT COMPANY,
THE CLEVELAND ELECTRIC ILLUMINATING COMPANY,
THE TOLEDO EDISON COMPANY,
OHIO EDISON COMPANY, and
PENNSYLVANIA POWER COMPANY,

                                        Appellants

                    v.

WESTINGHOUSE ELECTRIC CORPORATION


On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil Action No. 91-720)


Argued August 25, 1995

BEFORE:  GREENBERG, COWEN and SAROKIN, Circuit Judges

(Filed: September 12, 1995)

                        John H. O'Neill, Jr. (argued)
                        James B. Hamlin
                        Linda S. Wendtland
                        David C. Goldberg
                        Shaw, Pittman, Potts &
                                Trowbridge
                        2300 N Street, N.W.
                        Washington, D.C.  20037

                        John H. Bingler, Jr.
                        Deborah P. Powell
                        Thorp, Reed & Armstrong
                        One Riverfront Center
                        Pittsburgh, PA  15222

                        Edwyna G. Anderson
                        Larry R. Crayne
                        Duquesne Light Company

One Oxford Centre
301 Grant Street
Pittsburgh, PA  15279

                    Attorneys for Appellants


James W. Quinn
Mindy J. Spector (argued)
Weil, Gotshal & Manges
767 Fifth Avenue
New York, NY  10153

Kevin W. Brode
Westinghouse Electric
Corporation
STC/701 Building
1310 Beulah Road
Pittsburgh, PA  15235

                    Attorneys for Appellee


OPINION OF THE COURT


GREENBERG, Circuit Judge.

The plaintiffs appeal from judgments entered against them on all counts o

complaint.  The district court granted the defendant summary judgment on certain of

plaintiffs' counts and dismissed others by granting defendant's motion made pursuan

Fed. R. Civ. P. 50(a) at the close of plaintiffs' case.  On the one remaining claim

jury returned a verdict in favor of the defendant.  Because we find no merit in the

of issues the plaintiffs raise, we will affirm the judgment and orders of the distr

court.

## I.  INTRODUCTION

The plaintiffs -- Duquesne Light Company, The Cleveland Electric Illumina

Company, The Toledo Edison Company, Ohio Edison Company, and the Pennsylvania Power

Company -- together constructed and own the Beaver Valley Nuclear Power Station, a

unit nuclear energy generating facility located near Pittsburgh Pennsylvania.  Duqu

points out that it had primary responsibility for supervising the construction of t

plant, and it now "operates the plant on behalf of the co-owners."  Br. at 5 n.2.

therefore will refer to the plaintiffs singularly as Duquesne.

In the 1960's, Duquesne issued a request for proposals and bid specificat

for equipment to be used at the plant. Westinghouse submitted a proposal, and, afte

negotiations, entered into a contract with Duquesne under which it agreed to supply

Nuclear Steam Supply Systems (NSSS) for the Beaver Valley units.  It is beyond doub

during these negotiations the parties had sophisticated technical, commercial, and

advice.  The parties executed the contracts for the units respectively on October 3

and January 5, 1972.  Each NSSS contains a nuclear reactor, three steam generators,

number of other components that together convert heat from nuclear fission into ste

The steam generators for the first unit were installed in 1972; those for the secor

were installed in 1981.  The units began commercial operations in, respectively, Ap

1977 and November 1987.  Duquesne contends that when it negotiated the contracts, i

3

sought steam generators that would last approximately 40 years and it points to fac
tend to support that contention.   For instance the method of installing the NSSS
equipment makes removing or replacing the steam generators extremely difficult.

In the 1980s, Duquesne discovered corrosion and cracking in the generator
shaped Inconel-made tubes through which radioactive water is pumped from the reacto
vessel to the steam generators.   Such corrosion and cracking affect both the plant'
output and safety.   Duquesne engaged experts to examine the rapid deterioration who
concluded, among other things, that the tube material -- Inconel 600 -- made the eq
unusually susceptible to corrosion.   Duquesne ultimately determined that it would h
replace the steam generators.

On April 30, 1991, Duquesne filed this action against Westinghouse allegi
breach of contract, breach of warranty, breach of the Uniform Commercial Code duty
faith, fraud, negligent misrepresentation, and violations of the Racketeering Influ
and Corrupt Organizations Act, 18 U.S.C. § 1962(b) and (c).   On December 1, 1993,
Westinghouse filed a motion for summary judgment on all counts of the complaint.   T
district court referred the motion to a magistrate judge who issued a thorough and
detailed report and recommendation on July 18, 1994. In an order dated August 29, 1
the district court adopted (with modifications) the magistrate judge's report and
recommendation, and granted Westinghouse summary judgment on Duquesne's negligent
misrepresentation claim and on its claim under 18 U.S.C. § 1962(b).   The court deni
motion in all other respects,[0] and rejected Westinghouse's argument that the variou
statutes of limitations and repose precluded Duquesne's claims.

The case proceeded to trial on September 12, 1994.   At the close of Duque
case Westinghouse moved for judgment as a matter of law, and on October 24 the dist

---

[0]The court divided Duquesne's section 1962(c) claim into two parts, and granted sum
judgment on one of them.   Thus, the court granted Westinghouse's motion insofar as
claim was based on the "Nuclear Supplier Enterprise" but denied it insofar as it wa
on the "Beaver Valley Project Enterprise."

court in a bench opinion granted that motion in most respects.  It dismissed Duques

claims of breach of contract, breach of warranty, breach of the duty of good faith

fair dealing, and violations of RICO.  It also dismissed Duquesne's claim for punit

damages.  The court permitted Duquesne's fraud claim, however, to go to the jury.

December 6, 1994, the jury returned a verdict in favor of Westinghouse on that clai

court entered judgment on December 7, and Duquesne timely filed a notice of appeal.

have jurisdiction pursuant to 28 U.S.C. § 1291. Because of the RICO claim, the dist

court exercised subject matter jurisdiction under 18 U.S.C. § 1964(c) and 28 U.S.C.

and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 136

## II. DISCUSSION

### A. The Verdict

### 1. The Trial Time Limitations

We begin with Duquesne's attack on the jury verdict, since the jury's fir

impact on our analysis of the other claims.  Duquesne's primary argument challengir

verdict involves the district court's allocation of trial time.  During a pretrial

conference, the parties and the court agreed to limit each side's time to 140 hours

include the sum of that party's case, its cross-examination of the opposing party's

witnesses, and its opening and closing arguments.  App. 87.  But on the 12th day of

the court, frustrated with what it perceived as duplication of evidence, and concer

that the complicated technical testimony was confusing the jury, concluded that "al

business I have given you about 141 hours is off now."  App. 823.[0]  The court ruled

each side would receive 22 days to present its case.  And since Duquesne already ha

---

[0] Westinghouse has filed a notice of appeal from the district court's denial of most

motion for summary judgment.  We are dismissing the appeal and striking the additic

brief Westinghouse filed in support of that appeal.

[0] The parties as well as the district court all agreed that Pennsylvania law governs

state law claims.  Accordingly, we apply Pennsylvania law.

[0] According to the transcript the court did say 141 rather than 140 hours.

5

up 11 days, the court allowed it only an additional 11.  App. 827-28. Furthermore,

did not necessarily entail an entire day. Rather, as long as some testimony was hea

given day, it counted as a full day.  Duquesne argues that because it had budgeted

trial time during the first 11 days based on the 140 hour schedule, "[t]he district

court's unilateral change in the basic trial rules caused irreparable prejudice" to

case.  Br. at 34.  We review a district court's decisions in its management of a tr

abuse of discretion.  See Reed v. Philadelphia, Bethlehem & New England R.R. Co.,

128, 133 (3d Cir. 1991) ("In matters of trial procedure such as that involved here,

trial judge is entrusted with wide discretion because he [or she] is in a far bette

position than we to appraise the effect" of a particular procedure on the parties.)

Although the procedural rules governing federal civil litigation do not

explicitly authorize a district court to set time limits for a trial, a district co

inherent power "to control cases before it," provided it exercises the power "'in a

that is in harmony with the Federal Rules of Civil Procedure.'"  G. Heileman Brewin

v. Joseph Oat Corp., 871 F.2d 648, 652 (7th Cir. 1989) (en banc) (quoting Landau &

Ltd. v. Hribar Trucking, Inc., 867 F.2d 996, 1002 (7th Cir. 1989)).  The rules repe

embody the principle that trials should be both fair and efficient.  Thus, the Fede

Rules of Civil Procedure "shall be construed and administered to secure the just, s

and inexpensive determination of every action." Fed. R. Civ. P. 1.  Similarly, the

Rules of Evidence "shall be construed to secure . . . elimination of unjustifiable

and delay."  Fed. R. Evid. 102.  More particularly, Fed. R. Evid. 403 allows judges

exclude even relevant evidence because of "considerations of undue delay, waste of

or needless presentation of cumulative evidence."

Numerous courts have inferred from these provisions a court's authority t

time limits.  See, e.g., MCI Communications Corp. v. American Tel. & Tel. Co., 708

1081, 1171 (7th Cir.) (setting a period of time for the trial is "not, per se, an a

discretion"), cert. denied, 464 U.S. 891, 104 S.Ct. 234 (1983); Harris v. Marsh, 67

6

Supp. 1204, 1235 & n.42 (E.D.N.C. 1987) (allowing each side a total block of hours

direct and cross examination), rev'd in part on other grounds, 914 F.2d 525 (4th Ci

1990), cert. denied, 499 U.S. 959, 111 S.Ct. 1580 (1991); United States v. Reaves,

Supp. 1575, 1580 (E.D. Ky. 1986); SCM Corp. v. Xerox Corp., 77 F.R.D. 10, 13 (D. C

1977). We similarly believe that courts have discretion to impose limits on a part

trial presentation without the necessity of ruling specifically on "each particular

of evidence offered." SCM Corp., Id. at 13. After all, "'it has never been suppos

a party has an absolute right to force upon an unwilling tribunal an unending and

superfluous mass of testimony limited only by [its] own judgment and whim.'" MCI

Communications, 708 F.2d at 1171 (quoting 6 Wigmore, Evidence § 1907 (Chadbourne Re

1976)). Indeed, some district judges have found that the imposition of time limits

increases the efficiency of the trial from everybody's perspective. As one court h

explained:

> 'It requires counsel to exercise a discipline of economy choosing
> between what is important and what is less so. It reduces the
> incidence of the judge interfering in strategic decisions. It gives a
> cleaner, crisper, better-tried case. It gives a much lower cost to
> the clients. Finally, it will save months of our lives.'

United States v. Reaves, 636 F. Supp. at 1580 (quoting Leval, From the Bench, Litig

at 8 (1985)).

However, because by their very nature such procedures can result in court

dispensing with the general practice to evaluate each piece of offered evidence

individually, district courts should not exercise this discretion as a matter of co

As one court has put it, witnesses should not be excluded "on the basis of mere num

MCI Communications, 708 F.2d at 1171. Rather, a district court should impose time l

only when necessary, after making an informed analysis based on a review of the par

proposed witness lists and proffered testimony, as well as their estimates of trial

And, the court must ensure that it allocates trial time evenhandedly. But still th

7

courts need not allow parties excessive time so as to turn a trial into a circus. [...] all, a court's resources are finite and a court must dispose of much litigation. [...] short, the litigants in a particular case do not own the court.

The district court's action in this case differs from that taken in the [...] cite above because here the court granted each party a specific allotment of time, [...] halfway through Duquesne's case rescinded some of the grant. As a general matter, [...] the task of counsel, not the Court, to make the selection of materials most appropr[...] for introduction into evidence." SCM Corp., 77 F.R.D. at 12-13. Thus, while court[...] certainly should have flexibility in reassessing imposed time limits, they ordinari[...] should allow a party to fill its allotment with whatever evidence that party deems [...] appropriate, subject, of course, to rules of admissibility independent of the overa[...] limitation for the case being tried. As a corollary, an allocation of trial time [...] upon by the parties should not be taken away easily and without warning.

SCM Corp. provides a good illustration of when mid-trial imposition of ti[...] limits is appropriate. There, the court "repeatedly brought to the attention of [...] plaintiff's counsel a concern that the pace of the trial seemed unlikely to comport[...] the original estimates." 77 F.R.D. at 13. The court sought witness lists, request[...] plaintiff's counsel to re-estimate the time he needed, "cautioned counsel that some[...] rigorous action would have to be taken to keep the trial within manageable limits a[...] urged a reconsideration of the amount of material to be introduced and the presenta[...] a less ambitious schedule." Id. at 13. When the court's numerous efforts proved [...] unavailing, it sua sponte imposed constraints upon the parties' trial time. But eve[...] the court allotted plaintiff "50% more than the top range of counsel's [original] [...] estimate." Id. at 15. In other words, while the court issued a time constraint on[...] mid-trial, it still allowed the parties the only allocation of time upon which they[...] reasonably could have relied.

8

Here, however, the district court neither requested nor reviewed any prof[

materials prior to issuing its mid-trial order. While Westinghouse contends that t[

court repeatedly warned Duquesne of its cumulative presentation, it refers us only [

series of isolated instances over 11 days of testimony in which the court sustained[

objections because testimony was repetitive or because a question was asked and ans[

See, e.g., app. 401 ("We have been through that before and we are not going to go t[

it again."); app. 649-50 ("We have been over this a number of times."); app. 666 ("[

been over this with another witness. We are not going to repeat it again."); app. [

(sustaining "asked and answered" objection); app. 727 ("We have been over this."); [

762 ("You have already asked him that."); app. 782 (sustaining "asked and answered"[

objection); id. at 794 (same). Thus, unlike in SCM Corp., the court here gave Duqu[

little indication of the consequences of its trial behavior.

Further still, the method by which the district court calculated a party'[

is puzzling. Westinghouse's cross-examination of Duquesne's witnesses counted agai[

Duquesne's time, and vice versa. Therefore, Duquesne contends that the court's orc[

rather than promoting efficiency at trial, made it difficult for the parties to "c[

the clock and accurately budget their time." Br. at 34 n.28. Finally, Duquesne al[

certainly planned its trial strategy based on the initial 140 hour allotment, and w[

court took its action well into its case, Duquesne had little opportunity to reasse[

plans. Westinghouse, on the other hand, had a full 11 days, i.e., the balance of ti[

remaining after the court modified the time allocation on Duquesne's case, to reass[

initial budget and modify its trial strategy accordingly.

Nevertheless despite our concern about the district court's action, we wi[

reverse because we are unable to conclude that its ruling had any impact on the out[

the case. In the first place, Duquesne in its brief speaks of prejudice in vague a[

general terms, and therefore fails to delineate how the district court's decision [

adversely affected its case. Moreover, our independent review of Duquesne's motion[

9

reconsideration of the altered trial schedule filed the day after the court's sched

ruling as well as the offer of proof Duquesne made at the close of its case leave u

unconvinced that its proposed testimony would have added much to what it introduced

its allotted time.  Finally, the fact that Duquesne seems to use the district court

order to attack only the jury verdict but not the claims upon which the court grant

Westinghouse judgment as a matter of law, makes us wary of accepting Duquesne's arg

Therefore, we do not believe the district court's action constitutes reversible err

we decline to reverse on this ground.

## 2.  The Jury Instructions

Next, Duquesne challenges the district court's jury instructions.  We rec

explained that:

> Generally, '[t]he standard of review for the district court's ruling
> on points for charge is . . . abuse of discretion.'  Link v. Mercedes-
> Benz of North America, Inc., 788 F.2d 918, 922 (3d Cir. 1986).  Where,
> as here, a party contends that the charge as given states an incorrect
> legal standard, 'we will review the charge as a whole in the light of
> the evidence to determine if it fairly and adequately submitted the
> issues to the jury and we will reverse if the instructions were
> capable of confusing and thereby misleading the jury.'  Griffiths v.
> CIGNA Corp., 988 F.2d 457, 462 (3d Cir.) (citing Limbach Co. v. Sheet
> Metal Workers Int'l Ass'n, 949 F.2d 1241, 1259 n.15 (3d Cir. 1991) (in
> banc)), cert. denied, ____ U.S. ____, 114 S.Ct. 186 (1993).

Fashauer v. New Jersey Transit Rail Operations, Inc., 57 F.3d 1269, 1273 (3d Cir. 1

First, Duquesne contends that the district court erred in denying its rec

charge the jury that nondisclosures can constitute fraud.  In this ruling, the cour

relied on Restatement (Second) of Torts § 551 which it determined constitutes Penns

law on the issue.  Section 551 of the Restatement provides that liability may be in

on a party to a business transaction only when it has a duty to speak.  That duty,

according to the Restatement, exists only in limited circumstances, including (1) w

_____

[0]The one exception is Duquesne's conclusory statement that it "could have presented
more evidence [supporting its RICO claim] if [its] trial time had not been arbitrar
unfairly cut in half by the district court."  Br. at 46 n.33.

10

there is a fiduciary, or confidential, relationship between the parties; (2) when

disclosure is necessary to prevent an ambiguous or partial statement from being

misleading; (3) where subsequently acquired knowledge makes a previous representati

false; (4) where the undisclosed fact is basic to the transaction.  Restatement (Se

of Torts § 551(2).

The threshold inquiry on this point is whether Pennsylvania has adopted s

551.  In Neuman v. Corn Exchange Nat. Bank & Trust Co., the Pennsylvania Supreme Co

held that "[t]he deliberate nondisclosure of a material fact amounts to culpable

misrepresentation no less than does an intentional affirmation of a material falsit

A.2d 759, 764 (Pa. 1947). Although the court did not delineate the elements of the

it specifically cited to Restatement section 551.  Id.  Numerous intermediate appel

courts in Pennsylvania have followed Neuman's lead and held, following the principl

the Restatement, that to be liable for material nondisclosures, a party must have a

to speak.  In the oft-cited Smith v. Renaut, 564 A.2d 188 (Pa. Super. Ct. 1989), th

Pennsylvania Superior Court began its analysis by noting that "'fraud consists in a

calculated to deceive, whether . . . it be . . . by speech or silence. . . . It is

artifice by which a person is deceived to his disadvantage.'"  Id. at 192 (quoting

McClellan Estate, 75 A.2d 595 (Pa. 1950)).  But, the court continued, "[w]hile a

concealment may constitute fraud, mere silence is not sufficient in the absence of

to speak."  Id.  In that case, the court held that "a seller has an affirmative dut

disclose a known termite infestation."  Id. at 192 (citing Quashnock v. Frost, 445

121, 124 (Pa. Super. Ct. 1982) (in banc)).  Similarly, in Wilson v. Donegal Mut. In

598 A.2d 1310, 1315-16 (Pa. Super. Ct. 1991), the court held that "[c]oncealment ca

sufficient basis for finding that a party engaged in fraudulent conduct, . . . howe

mere silence is not sufficient in the absence of a duty to speak."  See also Quashn

Frost, 445 A.2d at 130 (Spaeth, J., concurring) (relying on section 551).  In Estat

Evasew v. Evasew, 584 A.2d 910 (Pa. 1990), the Supreme Court of Pennsylvania explic

11

approved the duty to speak prerequisite, holding that "an omission is actionable as

only where there is an independent duty to disclose the omitted information."  Id.

(relying on City of Harrisburg v. Bradford Trust Co., 621 F. Supp. 463 (M.D. Pa. 19

But while Pennsylvania courts have adopted the duty to speak requirement,

cases leave us uncertain of the extent to which Pennsylvania law includes the

Restatement's discrete criteria for when a duty to speak arises.  Furthermore, the

district court incompletely analyzed the elements of section 551 -- looking only at

whether there was a confidential relationship between the parties.  Nevertheless, w

conclude that Pennsylvania courts would not impose liability in the circumstances o

case.  Pennsylvania courts analyzing whether there was a duty to speak rely almost

exclusively on the nature of the contract between the parties and the scope of one

reliance on the other's representations.  Thus, in the termite infestation cases, s

Quashnock v. Frost, 445 A.2d 121, and Smith v. Renaut, 564 A.2d 188, the buyer is a

whim of the seller to disclose such latent problems, which discoverable by other

reasonable means. In those circumstances, it cannot be said fairly that by failing

disclose the seller is legitimately enhancing his or her bargain.  Similarly, in Ne

the plaintiff "justifiably" relied on a bank's representation that another party ha

offered a specific amount for the stock itself, see Neuman, 51 A.2d at 764; in that

the bank was the only reasonable source of the information.  Id. at 765.  And in Sc

Co. v. Rockwell-Standard Corp., 285 A.2d 451 (Pa. 1971), cert. denied, 407 U.S. 920

S.Ct. 2459 (1972), the court analyzed the duty to speak under reliance principles,

⁰Gibbs v. Ernst, 647 A.2d 882, 889 n.12 (Pa. 1994), did not change things.  In that
the Supreme Court of Pennsylvania noted that "[t]he tort of intentional non-disclos
the same elements as the tort of intentional misrepresentation except that in a cas
intentional non-disclosure the party intentionally conceals a material fact rather
making an affirmative misrepresentation."  While the Court did not expressly point
duty to speak requirement, in reaching its conclusions it relied on Neuman v. Corn
Exchange Nat'l Bank & Trust, Wilson v. Donegal Mut. Ins. Co., and Smith v. Renaut.
cases, which go into more detail on the subject, all imply a duty to speak requirem

12

held that "the jury could have concluded that [the defendant] knowingly abused [plaintiff's] confidence." Id. at 456.

None of these cases is applicable to the situation present here, where th parties are sophisticated business entities, with equal and ample access to legal representation. "[S]uperior information and better business acumen are legitimate advantages, which lead to no liability." Restatement (Second) of Torts § 551 comme As Westinghouse correctly points out, there is virtually no Pennsylvania case in wh defendant has been held to have a duty to speak when both the plaintiff and defenda sophisticated business entities, entrusted with equal knowledge of the facts. We a note that while the court did not explicitly charge the jury to consider omissions, permitted Duquesne's counsel to argue "that the misrepresentation consists of both statement and a partially correct statement that requires other information in orde correct." App. 1930. This ruling was tantamount to allowing Duquesne to present i fraudulent omission claim to the jury.

Duquesne also contends that the district court's jury instructions did no permit the jury to consider Westinghouse's post-contract fraud. Duquesne relies or district court's statement at the beginning of its charge that "[p]laintiffs allege the defendant fraudulently induced them to enter into certain contracts by making f representations." App. 1978. However, the district court, in delineating the eleme a fraud claim, did not limit the claim temporally. Moreover, Westinghouse points o the verdict form paralleled the substantive fraud instruction rather than the court initial comments. Further still, the judge's preliminary instructions did include characterization of Duquesne's contention that Westinghouse "continued to defraud [Duquesne] by making additional misrepresentations . . . ." App. 126. Finally, Du in its closing arguments referred repeatedly to Westinghouse's post-fraud actions.

13

Although the instructions were not absolutely clear we do not believe that the cha[rge as a] whole presents an incorrect view of the law.[0]

Finally, Duquesne argues that the jury verdict must be overturned because [the] district court made numerous evidentiary errors. In particular, it contends that t[he] court erred in excluding two exhibits, an expert's testimony and certain rebuttal evidence. We have reviewed these claims and find no error of law or abuse of discr[etion] in these rulings. We therefore will affirm the judgment entered on the jury verdi[ct.]

## B. The Judgment As a Matter of Law

Duquesne next challenges the district court's grant of Westinghouse's mot[ion for] judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a). We exercise plenary [review] over the district court's grant of a Rule 50(a) motion, see McDaniels v. Flick, 59 [F.3d] 446, 454 (3d Cir. 1995). A district court should grant such a motion only if, view[ing] the evidence in favor of the nommoving party, no reasonable jury could find liabili[ty on a] particular point. Id. (citing Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 11[66 (3d] Cir. 1993)).

## 1. Failure to Deliver Conforming Goods

Duquesne contends that the district court erred by refusing to send its c[ontract] claim of "failure to deliver conforming goods" to the jury. The district court gra[nted] Westinghouse's motion for judgment as a matter of law on this count, concluding tha[t] "[t]he contract is unambiguous in providing that the design life of the steam gener[ator] was not a guarantee." We agree.

Of course, the goal of contract interpretation is to discover the parties['] objective mutual intent. Under Pennsylvania law "'[i]t is firmly settled that the [intent]

---

[0]Duquesne cites to portions of Westinghouse's closing statement as prejudicing its [breach of] contract allegations, but it does not appear that Duquesne preserved its objections [to the] closing argument.

14

of the parties to a written contract is contained in the writing itself.'"  Samuel

Rappaport Family Partnership v. Meridian Bank, 657 A.2d 17, 21 (Pa. Super. Ct. 1995)

(quoting Krizovensky v. Krizovensky, 624 A.2d 638, 642-43 (Pa. Super. Ct. 1993));

Hullett v. Towers, Perrin, Forster & Crosby, Inc., 38 F.3d 107, 111 (3d Cir. 1994)

("Pennsylvania courts apply the 'plain meaning rule' of interpretation of contracts

assumes that the intent of the parties to an instrument is 'embodied in the writing

. . . .'") (citation omitted).  Thus, where, as here, the parties have reduced their

agreement to writing, Pennsylvania courts presume that the parties' mutual intent

ascertained by examining the writing.  Only where the writing is ambiguous may the

factfinder examine all the relevant extrinsic evidence to determine the parties' mu

intent. Allegheny Int'l, Inc. v. Allegheny Ludlum Steel Corp., 40 F.3d 1416, 1424

1994).  Therefore, as a preliminary matter, courts must "'determin[e] as a matter o

which category written contract terms fall into -- clear or ambiguous.'"  Id. (cita

omitted).  There are, as we recently noted, two kinds of ambiguity, patent ambiguit

latent ambiguity:

> '[a] patent ambiguity is that which appears on the face of the
> instrument, and arises from the defective, obscure, or insensible
> language used.'  Black's Law Dictionary 105 (rev. 4th ed. 1968).  In
> contrast, a latent ambiguity arises from extraneous or collateral
> facts which make the meaning of a written agreement uncertain although
> the language thereof, on its face, appears clear and unambiguous.
> Easton v. Washington County Ins. Co., 137 A.2d 332 (1957).'

Allegheny, 40 F.3d at 1424 (quoting Steuart v. McChesney, 444 A.2d 659, 663 (Pa. 19

Because of Pennsylvania's presumption that the writing conveys the partie

intent,

> '[a] contract will be found ambiguous "if, and only if, it is
> reasonably or fairly susceptible of different constructions and is
> capable of being understood in more senses than one and is obscure in
> meaning through indefiniteness of expression or has a double meaning.
> A contract is not ambiguous if the court can determine its meaning
> without any guide other than a knowledge of the simple facts on which,
> from the nature of the language in general, its meaning depends; and a

15

> contract is not rendered ambiguous by the mere fact that the parties
> do not agree on the proper construction."'

Meridian Bank, 657 A.2d at 21-22 (quoting Krizovensky, 625 A.2d at 642-43).

Pennsylvania law permits courts to examine certain forms of extrinsic evi[dence] in determining whether a contract is ambiguous. But lest the ambiguity inquiry deg[enerate] into an impermissible analysis of the parties' subjective intent, such an inquiry appropriately is confined to determining "the parties' linguistic reference." Mell[on] Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1011 n.12 (3d Cir. 1980). [In] other words, "extrinsic evidence may be utilized to demonstrate the existence of a[n] ambiguity." Meridian Bank, 657 A.2d at 22 (citing Lohmann v. Piczon, 487 A.2d 1386 [(Pa. Super. Ct.] 1985)). Thus, as we pointed out in Mellon Bank, when the contract refers to $10,00[0,] unless we looked at extrinsic evidence we might never learn that the parties were [in fact] referring to Canadian rather than American dollars. 619 F.2d at 1011 n.12. In mak[ing our] ambiguity determination, then, we "'consider the words of the contract, the alterna[te] meaning suggested by counsel, and the nature of the objective evidence to be offere[d in] support of that meaning.'" Hullett, 38 F.3d at 111 (citation omitted).

The essence of Duquesne's contract claim is that Westinghouse agreed to p[rovide] steam generators that would last for 40 years. Unable to point to any provision in [the] contract that clearly supports this proposition, Duquesne predicates this claim lar[gely on] the following provision of the contract's technical specifications:

> Consideration shall be taken of all NSSS components subject to the
> loss of ductility arising from integrated neutron exposure (nvt) based
> on a minimum station life of 42 yr operating at an 85 per cent load
> factor. The reactor internals shall be so designed that they may be
> completely removed by remote handling techniques without the use of
> divers.

App. 2228.[0] Duquesne's reading would stretch this language to unimaginable proport[ions,] as it would turn the 42 year station life by which certain components were to be ju[dged]

---

[0]Except for this provision, Duquesne cites contract clauses that do not even relate [to the] life of the components.

into an express contractual guarantee that the steam generators themselves would la

40 years.  Contrary to Duquesne's interpretation, this provision clearly and by its

terms covers only components subject to the loss of ductility arising from neutron

exposure.  Duquesne points to no evidence in the record that steam generators were

to such loss of ductility.  The evidence in fact shows the contrary.  App. 488-89

(Campbell testimony) (steam generators are not "subject to the loss of ductility ar

from integrated neutron exposure").[0]

Moreover, we find support in this interpretation from the format, constru

and terms of the contract generally. First, the provision on which Duquesne relies

contained not in the contract proper but in its third exhibit which details "techni

specification for nuclear equipment and nuclear steam supply system."  There is an

in the contract proper entitled "Warranties," see App. 2159, which one would expect

include any such guarantee, if there was one, in explicit terms.  Second, as we dis

---

[0]When pressed further, Duquesne's witness' testimony confirms the lack of merit in
Duquesne's contract language-based argument:

> A:   . . . I don't believe that this paragraph was intended in any way
> to suggest that only those components subject to high neutron
> radiation would be designed for 42 years, but this paragraph was
> intended to ask for particular attention to be paid those components.
>
> Q:   Well, can you show me any provision in the bid specification,
> because I haven't been able to find it, that states the steam
> generators shall last for 40 years?  Can you find that language any
> place in the bid specification, Mr. Campbell?
>
> A:   I don't know that I can, but it was generally understood by all
> concerned that the plant was expected to last for more than one year.
> It wasn't expected to last for all eternity, but it was expected to
> last for some reasonable number of years, and that reasonable number
> of years, it was understood, was about 40 years.

App. 489.  Of course, the parties' expectations, standing alone, are irrelevant wit
any contractual hook on which to pin them. For example, if the contract provided th
steam generators would "last for a significant period of time," the analysis would
be different.  In such a case, not only would a factfinder need to define "reasonab
but the duty of good faith, discussed infra, might affect a determination of the pa
reasonable expectations.

17

below, the "Warranties" section provides in no uncertain terms that "[t]he warranti

remedies set forth herein are exclusive and are in lieu of all other warranties and

remedies whether statutory, express or implied." Contract Art. IV(C) at app. 2162.

section provides that the equipment "shall be suitable for operation as part of the

sold hereunder" but that "[t]he equipment warranty shall expire one year after succ

completion of the Performance Test, but not later than three years after SHIPMENT,

whichever occurs first." Art. IV(B) at app. 2160. A plain reading of this section

precludes Duquesne's contractual argument.[0]

Duquesne does not dispute that this warranty provision is a binding part

contract. Rather, it contends that the warranty clause contradicts the specificati

provision on which it relies, and therefore, "'[g]iven a head-on conflict between a

express warranty and a disclaimer, the disclaimer is the one that suffers.'" Reply

5 (quoting 1 Quinn's Uniform Commercial Code Commentary and Law Digest § 2-313[A][1

2-219 (2d ed. 1991)). Whatever the merits of Duquesne's legal reasoning, here ther

head-on collision. To the contrary, the warranty provision simply confirms our

straightforward reading of the specifications. After all, "[t]he strongest externa

of agreement between contracting parties is the words they use in their written con

Mellon Bank, 619 F.2d at 1009.

Duquesne's argument would be more plausible if it cited evidence of custo

the industry in agreeing to contract terms, or the parties' prior practice. But th

evidence on which it relies is not probative of ambiguity. First, it cites the tec

bid specifications Duquesne issued to which Westinghouse apparently did not object.

at 20-21. Of course, the specific language in the contract trumps these specificat

---

[0] Based on Duquesne's counsel's comments at oral argument, we expect Duquesne to pro
that we are confusing its contractual argument with its warranty claim. If so we s
accused. In point of fact, we do believe that Duquesne's contract-based argument i
simply a back-door means of expanding the warranty period beyond what the parties
bargained for.

18

but at any rate the documents are not inconsistent.  Second, Duquesne relies on tes

that the parties, including Westinghouse, <u>expected</u> the steam generators to last for

years and that no provision was made to remove the steam generators if they became

defective prior to that.  Br. at 21-22.  <u>See</u>, <u>e.g.</u>, app. 899 (testimony of Westingh

official Stern) ("I didn't think it was necessary to provide an opening in the vapo

containment for the removal of the steam generator."); app. 423 (testimony of Duque

representative recalling conversation with Stern); app. 317 (testimony of Superinte

of Construction at facility) ("There were no provisions made for the steam generato

be removed.");  app. 371 (testimony of Duquesne representative regarding negotiatio

Westinghouse) ("[M]y understanding was that in all the discussions we had with

Westinghouse that the 42 years was the basis for the design of the plant.").  Of co

the parties' expectations or hope that the steam generators would last for 42 years

form the basis for reading a provision into the contract.  Duquesne cites no testim

that the <u>drafters</u> of the contract interpreted the provision it relies on to guarant

the steam generators would function for 42 years.  The closest Duquesne comes is th

testimony of Campbell, quoted earlier (<u>see</u> <u>supra</u>, n.8), who conceded that he could

find a provision in the bid specifications ensuring that the steam generators would

for 40 years.

As such, we will not rewrite the contract.  We therefore affirm the distr

court's ruling granting Westinghouse judgment on this count of the complaint.

### 2. <u>Breach of Warranty</u>

Next, Duquesne challenges the district court's dismissal of its breach of

warranty claim.  The contracts each provide that:

> Westinghouse warrants that the equipment furnished hereunder by
> Westinghouse shall be free from defects in workmanship and material
> and shall be suitable for operation as part of the NSSS sold
> hereunder.

\*   \*   \*

19

> The equipment warranty shall expire one year after successful completion of the Performance Test, but not later than three years after SHIPMENT, whichever occurs first. If, during said period, the Owner promptly notifies Westinghouse and establishes that the equipment warranty is not met, Westinghouse shall perform such repair replacement or modification as required to meet this equipment warranty.

app. 2160-61; app. 2338-39.

The district court, pointing out that "[t]he parties agree that the warra period under the Beaver Valley I contract expired on July 1st, 1976, and the warra period under the Beaver Valley 2 contract expired on May 31st, 1987," dismissed the for a number of reasons.  First, it held that Duquesne's argument was "contrary to unambiguous contractual language stating that the design life is not a guarantee." court also reasoned as an alternative argument that "the evidence at trial has esta that the alleged defect did not appear until after the expiration of the respective warranty periods. Plaintiffs did not negotiate for nor did they obtain a lifetime w regarding the steam generators."

Westinghouse is clearly correct that the contract clauses required the de manifest itself within one year.[0] Duquesne in substance argues that the contract pr it against defects existing at the time the generator was installed but not discove until after the warranty period.  Br. at 24. But the general rule, from which we se reason to deviate, is that "an express warranty does not cover repairs made after t applicable time . . . ha[s] elapsed."  <u>Abraham v. Volkswagen of Am., Inc.</u>, 795 F.2d 250 (2d Cir. 1986) (citing cases) (applying federal common law).  Thus, "'latent de discovered after the term of the warranty are not actionable." <u>Id.</u> at 249-50.  For example, in <u>Kodiak Elec. Ass'n v. Delaval Turbine, Inc.</u>, 694 P.2d 150 (Alaska 1984) defendant delivered a defective generator, but the defect manifested itself in an i only after the expiration of the express warranty period.  The court ruled that bec

---

[0] Duquesne purchased extensions of the warranties but it does not claim that the def appeared within the extension periods.

"the defect did not make its presence known until the time of the generator failure

nearly a year after the warranty had expired," the plaintiff did not have a breach

warranty claim. Id. at 157 (applying Alaska law). That is precisely the case here

also Canal Elec. Co. v. Westinghouse Elec. Co., 973 F.2d 988, 993 (1st Cir. 1992) (

law almost uniformly holds that time-limited warranties do not protect buyers agair

hidden defects -- defects that may exist before, but typically are not discovered u

after, the expiration of the warranty period.").

Duquesne tries to exempt itself from the general rule by pointing to diff

in the warranty language between its contract and those covered by the cases we cit

above. We find no qualitative difference in the language, however. To be sure, th

clause in Canal Elec. Co. provided that evidence of the defect must "appear" within

warranty period. Id. at 991. But in the first place, that fact was incidental to t

court's analysis. In that case, the plaintiff relied upon the word "appear" in arg

for an exception from the general rule. More importantly, the warranty language he

not ambiguous. It requires notice to Westinghouse of the defect within the warrant

period. Of course, notice cannot be given of an undiscovered defect. Therefore, t

district court's reading of the clause is the only fair reading. We will affirm th

court's dismissal of the breach of warranty count.[0]

### 3. Duty to Act in Good Faith

Duquesne also argues that the district court improperly granted Westingho

judgment on its claim that Westinghouse breached its contractual duty to act in goo

and to deal fairly. The district court dismissed the count because "[p]laintiffs h

cited any specific provision of the contract which would support the alleged duty o

Westinghouse." While the parties disagree about the scope of the duty provided in

_____

[0]In so doing, we reject Duquesne's argument that Westinghouse is equitably estopped
relying on the time limits contained in the warranty clause.

21

Uniform Commercial Code,[0] we need not dwell on these disagreements because the doct

no matter how broadly interpreted, has no application here.

The Uniform Commercial Code provision on good faith, codified as 13 Pa. C

Stat. Ann. § 1203 (1984), provides that "[e]very contract or duty within this title

imposes an obligation of good faith in its performance or enforcement."  Good faith

defined as "[h]onesty in fact in the conduct or transaction concerned."  Id. 1201.

rare exception, the courts use the U.C.C. good faith requirements in aid and furthe

of the parties' agreement, not to override the parties' agreement for reasons of fa

policy, or morality."  Steven J. Burton, Symposium:  The Revision of Article 2 of t

Uniform Commercial Code:  Good Faith in Articles 1 and 2 of the U.C.C.:  The Practi

View, 35 Wm. and Mary L. Rev. 1533, 1534 (1994).  Thus, courts generally utilize th

faith duty as an interpretive tool to determine "the parties' justifiable expectati

and do not enforce an independent duty divorced from the specific clauses of the co

Id. at 1542.  For example, a court may use the duty to impose a standard of conduct

requirements or output contract, to ensure that the parties' actions conform to the

reasonable expectations.  See Denise R. Boklach, Comment: Commercial Transactions:

Section 1-201(19) Good Faith --Is Now the Time to Abandon the Pure Heart/Empty Heac

45 Okla. L. Rev. 647, 667 (1992) (citing cases).

The cases on which Duquesne relies all applied the good faith duty in thi

manner to delineate the parties' reasonable expectations.  In Stelwagon Mfg. Co. v.

Roofing Sys., Inc., 862 F. Supp. 1361 (E.D. Pa. 1994), vacated in part on other gro

No. 94-2004 (3d Cir. Aug. 24, 1995), for example, the parties entered into a semi-

exclusive agreement for distribution of the defendant's products in the Philadelphi

Evidence showed that the defendant sold its goods "to distributors that, while situ

[0]We agree with the parties' assumption that the Uniform Commercial Code applies.
Nonetheless, Pennsylvania courts applying the U.C.C. definition of good faith gener
use common law contract principles.  See Somers v. Somers, 613 A.2d 1211, 1214 (Pa.
Ct. 1992) (equating Restatement and U.C.C. duties of good faith.).

22

just outside of Philadelphia, sold their goods into Philadelphia." Id. at 1367. [T]here was a legitimate question regarding "the parties' reasonable expectations" of the semi-exclusive distributorship arrangement would work. Id. In Doe v. Kohn Nast Graf, P.C., 862 F. Supp. 1310 (E.D. Pa. 1994), the court found that "[b]arring an from access to two of the crucial tools of his trade . . . is readily construable interference with, or at the very least a failure to cooperate in, the performance contractual obligations." Id. at 1325. Certainly, one would not expect a party wi one has a contract to interfere with its ability to carry out its end of the bargai

In the absence of a dispute about the parties' reasonable expectations un particular term of the contract, an independent "duty of good faith has been recogn [only] in limited situations." Creeger Brick and Bldg. Supply, Inc. v. Mid-State Trust Co., 560 A.2d 151, 153 (Pa. Super. Ct. 1989); Sensenig v. Spring Glen Farm Ki Inc., 1992 WL 540682 at * 2 (Pa. Cm. Pl. Aug. 4, 1992). After all, "[i]f contract parties cannot profitably use their contractual powers without fear that a jury wi second-guess them under a vague standard of good faith, the law will impair the predictability that an orderly commerce requires." Burton, 35 Wm. and Mary L. Rev. 1550. Thus, an independent contractual duty to act in good faith "has been imposed franchisors in their dealings with franchisees . . upon the relationship between in and insured . . . [and] in connection with an employer's attempt to recoup theft lo from the wife of an employee who was responsible for the thefts." Creeger, 560 A.2 153-54 (citing cases); see also Loos & Dilworth v. Quaker State Oil Ref. Corp., 500 1155, 1160 (Pa. Super. Ct. 1985) ("[A] franchisor must act both in good faith and i commercially reasonable manner when terminating a franchise.").

"The obligation to act in good faith . . . varies somewhat with the conte Somers v. Somers, 613 A.2d 1211, 1213 (Pa. Super. Ct. 1992). Here, Duquesne attemp read into the contract a provision which it neither bargained for nor attained -- a guarantee of 40 years. Furthermore, by its own admission Duquesne with this count

23

simply dressing up its fraud claim to avoid the "clear and convincing" evidentiary

See Br. at 27 ("This claim was particularly important because it could be proved by

preponderance of the evidence, as opposed to the 'clear and convincing' standard ap

to the fraud claim."). In this context -- where two sophisticated business entitie

engaged in an arms-length transaction --we do not believe that Pennsylvania courts

impose an independent duty of good faith not tied to a contractual term.[0]

## C. The Summary Judgment

Finally, Duquesne challenges the district court's grant of summary judgme

favor of Westinghouse on its negligent misrepresentation claim. The district court

adopted the magistrate's judge's reasoning and conclusion that the economic loss do

which prohibits plaintiffs from recovering in tort economic losses to which their

entitlement flows only from a contract, barred this count. We exercise plenary rev

over the district court's grant of summary judgment on this claim.

Although the economic loss doctrine can be traced to the 1965 decision in

v. White Motor Co., 403 P.2d 145 (Cal. 1965), application of the doctrine gained mo

when the Supreme Court adopted it in the context of admiralty products liability la

that posture, the Court held that "a manufacturer in a commercial relationship has

under either a negligence or strict products-liability theory to prevent a product

injuring itself." East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 85

S.Ct. 2295 (1986). In reaching its decision, the Court, noting that "if [products

liability remedies] were to progress too far, contract law would drown in a sea of

id. at 866, 106 S.Ct. at 2300, reasoned that "[w]hen a product injures only itself

reasons for imposing a tort duty are weak and those for leaving the party to its

contractual remedies are strong." Id. at 871, 106 S.Ct. at 2300. We since have

_____

[0]We reject Duquesne's tenuous attempts to tie the duty of good faith to particular
provisions of the contract.

24

interpreted East River to mean that "it is the character of the plaintiff's loss th

determines the nature of the available remedies." King v. Hilton-Davis, 855 F.2d 1

1051 (3d Cir. 1988) (applying Pennsylvania law). In other words, "[w]hen loss of t

benefit of a bargain is the plaintiff's sole loss, . . . the undesirable consequenc

affording a tort remedy in addition to a contract-based recovery [are] sufficient t

outweigh the limited interest of the plaintiff in having relief beyond that provide

warranty claims." Id.

Although the Pennsylvania Supreme Court neither has rejected nor adopted

doctrine, the state's intermediate appellate courts and federal courts applying

Pennsylvania law routinely have applied the East River principles. In REM Coal Co.

Clark Equip. Co., 563 A.2d 128 (Pa. Super. Ct. 1989) (en banc), the Superior Court

that "recovery in tort is barred in product liability actions between commercial

enterprises where the only damage alleged is to the product itself." Id. at 132. A

court explained, "contract theories such as breach of warranty are specifically aim

and perfectly suited to providing complete redress in cases involving . . . economi

losses." Id. at 129. Following the analysis of East River, the court pointed out

"such losses are based upon and flow from the purchaser's loss of the benefit of hi

bargain and his disappointed expectations as to the product he purchased. Thus, th

sought to be redressed is precisely that which a warranty action does redress." Id

New York State Elec. & Gas Corp. v. Westinghouse Elec. Corp., 564 A.2d 919, 925 (Pa

Super. Ct. 1989) (en banc), the court went still further, stating that "even in the

absence of the parties' agreements, we would nevertheless hold that [the plaintiff'

recovery for damages pleaded in the negligence and strict liability counts is barre

matter of law because the losses alleged are purely economic in nature and cannot b

recovered in negligence or strict liability." Id. at 925; see also Grode v. Mutual

Marine, and Inland Ins. Co., 623 A.2d 933, 934 (Pa. Commw. Ct. 1993).

25

In King we predicted that the Pennsylvania Supreme Court would apply the economic loss doctrine to preclude tort recovery against a manufacturer of a compon a product. King, 855 F.2d at 1051. And important in this context, in Lower Lake Do v. Messinger Bearing Corp., 577 A.2d 631 (Pa. Super. Ct. 1990), the plaintiffs atte to limit application of the economic loss doctrine to products liability cases, but court quickly rejected the invitation. Rather, it indicated "appellants' distincti without meaning. Our decision in REM Coal is not limited to products liability, bu equal application in negligence cases." Id. at 635.

Duquesne, however, argues that neither the economic loss doctrine specifi nor East River generally have any application here because Pennsylvania also has ac the Restatement (Second) of Torts § 552, which, Duquesne contends, governs all clai negligent misrepresentation. Section 552 provides as follows:

Information Negligently Supplied for the Guidance of Others

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

In Rempel v. Nationwide Life Ins. Co., 370 A.2d 366, 367 (Pa. 1977), the Supreme Co Pennsylvania noted that "the elements of the tort of negligent misrepresentations a stated in Section 552 of Restatement of Torts." See also Moffatt Enter., Inc. v. F Inc., 807 F.2d 1169, 1174 (3d Cir. 1986). Duquesne, however, draws too many infere from that statement.

First, Duquesne's argument relies on the inaccurate premise that section conflicts with a broad interpretation of the economic loss doctrine. In Rempel the did not engage in an analysis of the scope of section 552. See Rempel, 370 A.2d at Rather, after the court cited the section, it simply analyzed the case in standard

26

contract terms, albeit continuing to state that "this action is one in trespass for negligent misrepresentations rather than in assumpsit for breach of contract." Id. 370. For example, in discounting the defendant's assertion that the contract terms trumped any representations that were made during pre-contract negotiations, the co relied not on section 552 but on the "adhesion" nature of insurance contracts. Thu "[c]onsumers . . . view an insurance agent . . . as one possessing expertise in a complicated subject. It is therefore not unreasonable for consumers to rely on the representations of the expert rather than on the contents of the insurance policy i Id. at 368. Indeed, "[t]he idea that people . . . are under no duty to read a writ insurance policy is not novel." Id. at 369. And, importantly, the court pointed o "[t]he application form, which is the offer being made by the consumer, could be pr in large type in terms easily understood by the insured so that reliance on the age representations would not be necessary." Id. at 370. In other words, only because insurance contracts are written in arcane language that the ordinary consumer canno understand, which in turn forces the consumer to rely on the agent's representation the consumer not bound by the contract language.

Further still, in holding the parol evidence rule inapplicable, the court relied on contract rather than tort law. Specifically, the court discussed the con principle that "the parol evidence rule is no bar to oral testimony designed to sho the writing is not an integrated writing." Id. at 371. In fact, the court noted t "[w]hether or not the parol evidence rule should be inapplicable in all misrepresen cases is an issue we need not now decide." Id. at 370. Thus, notwithstanding the citation to section 552, its analysis relied almost exclusively on doctrines arisin of contract law. And to the extent that it relied on section 522, it was only beca strict application of common law contract principles would have worked an injustice case in which the parties clearly had unequal bargaining power.

27

The implication, of course, is that if the parties to the contract were sophisticated business entities engaging in an arms-length transaction, ordinary c[ontract] principles would govern their relationship. Properly read, then, Rempel supports Westinghouse's, rather than Duquesne's, position.

Second, a close reading of section 552 itself reveals that the Restatemen[t is] concerned with liability in cases where contract remedies are unavailable. The sec[tion's] imposition of liability on those who "suppl[y] false information for the guidance [of] others in their business transactions," does not lend itself very easily to a contr[act] situation. Indeed, virtually all the examples provided in the section involve liab[ility] to third parties. The reason is simple: where there is privity in contract betwee[n] parties, and where the policies behind tort law are not implicated, there is no nee[d for] an additional tort of negligent misrepresentation. Breach of contract, promissory estoppel, unjust enrichment, and other contract or quasi-contract remedies all prot[ect] parties who negotiate and reduce their agreement to writing.

The economic loss doctrine, then, is not at odds with section 552, but on[ly] covers situations in which "a party in privity of contract with another suffers an [injury] to a product itself, resulting in purely economic loss." Grode v. Mut. Fire, Marin[e &] Inland Ins. Co., 623 A.2d at 934. There is no reason in principle to carve out an exception to this rule when the negligence consists of misrepresentation and Duques[ne] points to no reported opinion doing so. Indeed, courts in jurisdictions which have adopted the economic loss doctrine routinely have declined to carve out an exceptio[n for] claims of negligent misrepresentation. See Eagle Traffic Control v. Addco, 882 F. [Supp.] 417, 419 (E.D. Pa. 1995) (applying Pennsylvania law) (economic loss doctrine applie[s to] claims of negligent misrepresentation); Apollo Group, Inc. v. Avnet, Inc., 58 F.3d [477,] 480 (9th Cir. 1995) (applying Arizona law) ("negligent misrepresentation is not an exception to the 'economic loss' rule."); Bailey Farms, Inc. v. Nor-Am Chem. Co., 2[7 F.3d] 188, 191 (6th Cir. 1994) (applying Michigan law) (same). The economic loss doctrin[e]

28

designed to "maintain[] the separate spheres of the law of contract and tort."  New

State Elect. & Gas. Corp., 564 A.2d at 925.  A party who engages in contractual

negotiations with another has the ability to protect itself in the contractual lang

against the other party's innocent, though wrong representations.

We therefore predict that the Pennsylvania Supreme Court would apply the

economic loss doctrine in this case, and we affirm the district court's grant of su

judgment.

## III. CONCLUSION

For all the reasons detailed above, we will affirm the orders and judgmen

the district court in their entirety.[0]

---

[0]Duquesne also contends that the district court erred in granting Westinghouse's Ru
50(a) motion on its RICO claim.  We have considered Duquesne's argument and find it
without merit.